**UNITED STATES COURT OF APPEALS**
**for the Fifth Circuit**

_____

No. 91-2144
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

HECTOR RAZO-LEORA and
EUGENIO BALDERAS, JR.,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Texas
_____
(May 15, 1992)

Before JOHNSON, KING, and DAVIS, Circuit Judges.

DAVIS, Circuit Judge:

Defendants, Hector Razo-Leora and Eugenio Balderas, appeal their convictions on various charges relating to a murder-for-hire conspiracy. We affirm.

## I.

In June 1988 in Houston, Texas, agents of the Drug Enforcement Agency arrested fourteen individuals, including Baldemar Garcia. Garcia was a longtime drug dealer who immediately began cooperating with law enforcement officials. Evidence Garcia provided led to the October 1988 arrest and indictment of defendant Razo-Leora's brother, Antonio Razo, for possession of cocaine with intent to distribute it. Trial was set for January 1989. Garcia was scheduled to testify at Razo's trial and at the December 1988 trial

of the fourteen individuals arrested in June. Antonio Razo believed that Garcia's information was responsible for his arrest.

Fermin Cabello lived in Houston for several months in 1981, when he met Eugenio Balderas, Jr. Balderas was an acquaintance of Antonio Razo's. When Cabello left Houston, he moved back to Chicago, where he had lived before moving to Texas. During a visit to Houston about two years before the events at issue in this case, someone pointed out Hector Razo-Leora to Cabello as Balderas's brother-in-law. Cabello had no other contact with Razo-Leora. In early December 1988, Balderas contacted Cabello and told him that he was having some problems and needed Cabello's help. He sent Cabello money for an airline ticket to Houston. When Cabello arrived in Houston on December 9, Balderas picked him up at the airport and explained that Balderas and others wanted Cabello to murder Garcia for "snitching."

Balderas and Cabello spent several hours that night unsuccessfully looking for Garcia's house. At about 3 a.m., they gave up for the evening and went to Balderas's house. There, Balderas offered Cabello $5,000 to kill Garcia. Balderas showed Cabello a .357 magnum pistol and gave him a car to use for the weekend and money for a hotel room. The following morning, Cabello tried to locate Garcia's house on his own. When he could not, he returned to Balderas' house and the two men searched for the house together. Balderas had given Cabello the .357 magnum by this time and Cabello had the pistol with him as they searched. Again unable to locate Garcia's house, they went to El Charrito, a restaurant

2

owned by Balderas's sister Norma, for lunch. Later, they returned to Balderas's house and then to the hotel in which Cabello had stayed the night before. Balderas had a nine millimeter pistol with him while at the hotel that Saturday night.

The next morning, Sunday, December 11, Cabello again tried unsuccessfully to locate Garcia's house. He then went to Balderas's house and told Balderas that he had to return to work on Monday in Chicago. After telling Cabello to be patient, Balderas made some phone calls trying to find the house. Balderas told Cabello that he was calling a person named Eddie and Balderas's compadre, Hector. A common meaning of the Spanish word "compadre" is godparent. A short time later, two people arrived at Balderas's house. Balderas left with them for about forty-five minutes, and when he returned he told Cabello that Eddie had shown him where Garcia lived. Balderas gave Cabello directions and told him that Garcia drove a blue pick-up truck. Even with these new directions, Cabello still could not find Garcia's house. He called Balderas, who picked Cabello up, drove him to the house and returned him to the car he had been using. After Balderas left, Cabello drove back to Garcia's house where he could see a blue pick-up but could not determine whether Garcia was there. Cabello went back to Balderas's house.

Balderas told Cabello he would call his "cunado," or brother-in-law. After making the call, Balderas told Cabello that it was Garcia's habit to get up at 6 a.m. Balderas gave Cabello $50, and Cabello drove back to Garcia's house where he noticed the blue

3

truck was gone.  Cabello went to get some food and make a phone call.  He returned to Garcia's street and parked in a lot down the block from the house.  A short while later, the blue pick-up drove by and pulled into Garcia's driveway.  Cabello followed the truck, parked and got out of his car.  When the driver of the pick-up got out of the truck, Cabello yelled out, "Baldo."  Garcia turned toward Cabello and Cabello shot him six times.

As Cabello left the scene of the shooting, he ran a stop sign. A Harris County Deputy Sheriff pulled him over, found the gun and realized from the smell that it had been fired recently.  He arrested Cabello.  Later, tests confirmed that this .357 magnum was the gun which had killed Garcia and that Cabello had fired the gun. Cabello was indicted for murder by the state.  Antonio Razo and another man, Eddie Pries, provided bond for Cabello, who returned to Chicago.  Cabello was later indicted on federal firearms charges and was returned to Houston.  Cabello agreed to plead guilty to the firearms charges and cooperate with the government so that his federal and state sentences would run concurrently.

Balderas's contacts with Cabello continued after Cabello's arrest.  Federal agents recorded two conversations between Cabello and Balderas.  The first was a telephone call during which Cabello complained that he had not been told that Garcia was a federal witness.  Cabello asked if Hector could put some money away for Cabello while he was in prison.  Balderas said he had not known Garcia was a federal witness and told Cabello not to talk about it on the telephone.  Later, federal agents videotaped a meeting

4

between Cabello and Balderas at a hotel. Cabello again complained of not knowing about Garcia's federal witness status and Balderas again said he had not known of it. Cabello stated that Hector must have known, and Balderas agreed that Hector probably did know. Cabello asked if Hector was going to put away some money for him and Balderas responded that it would be taken care of.

Balderas and Razo-Leora were indicted in August 1989 and charged with conspiring to travel in and use interstate commerce facilities in the commission of a murder for hire (Count 1), in violation of 18 U.S.C. §§ 2, 371 and 1958. Balderas was also indicted on four additional counts: aiding and abetting others to cause Cabello to travel in interstate commerce with the intent that Cabello commit a murder for hire (Count 2), in violation of 28 U.S.C. §§ 2 and 1958; perjury before a grand jury, in violation of 18 U.S.C. § 1623 (Count 3); solicitation of Cabello to commit murder for hire, in violation of 18 U.S.C. § 373 (Count 4); and using and carrying firearms during and in relation to the commission of the offenses identified in counts 1 and 2 (Count 5).

A jury convicted Razo-Leora on count 1 and Balderas on all five counts. The court sentenced Razo-Leora to sixty months in prison and three years of supervised release. In addition, the district court ordered him to pay a special $50 assessment and to make restitution to Garcia's widow of $100,000. Balderas was sentenced to a total of 360 months in jail and five years of supervised release, and was ordered to pay a special assessment of $250. The defendants appeal their convictions on each count. Both

5

defendants argue that the evidence was insufficient to support their convictions.  In addition, Razo-Leora contends that the district court erred in ordering him to make restitution to the victim's family and Balderas contends that the district court erred in its instruction to the jury on two of the counts against him. We consider each of these arguments below.

## II.

### A.

We begin our analysis with the issues raised by Razo-Leora. He argues first that the evidence is insufficient to support the verdict. In reviewing this claim, we consider "whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  **United States v. Edelman**, 873 F.2d 791, 793 (5th Cir. 1989).  Also, we must view the evidence, and all inferences reasonably drawn from it, in the light most favorable to the verdict.  **Glasser v. United States**, 315 U.S. 60, 62 (1942); **United States v. Hopkins**, 916 F.2d 207, 212 (5th Cir. 1990); **United States v. Molinar-Apodaca**, 889 F.2d 1417, 1423 (5th Cir. 1989).

To establish a conspiracy in violation of 18 U.S.C. § 371,[1]

---

[1]     Section 371 is the conspiracy statute.  It reads, in pertinent part,

> If two or more persons conspire to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

Section 1958 describes the "offense against the United States" at issue in this case and reads, in pertinent part,

6

the Government must prove three things: 1) an agreement between the defendant and one or more other persons to violate a law of the United States; 2) an overt act by one of the conspirators in furtherance of the conspiracy; and 3) the intent on the part of the defendant to further an unlawful objective of the conspiracy. **United States v. Hopkins**, 916 F.2d at 212.

We now turn to the evidence the government relies on to support Razo-Leora's single count of conviction, conspiracy to violate § 1958. The primary evidence against Razo-Leora is the testimony of two Government witnesses. The first is the gunman Cabello. According to Cabello, while Balderas and Cabello were trying to locate Garcia, Balderas sought directions by making a telephone call to Balderas's "compadre Hector." This Spanish term "compadre" is frequently used to mean "godparent." The evidence showed that Razo-Leora and Balderas's sister Norma were the godparents of one of Balderas's children. Later that day, a few hours before the murder, Balderas made another phone call to someone whom he referred to as "cunado." The purpose of this call

---

(a) Whoever travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or uses or causes another (including the intended victim) to use the mail or any facility in interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, shall be fined not more than $10,000 or imprisoned for not more than 10 years, or both; . . . .

was to find out when Garcia might return home. The term "cunado" means "brother-in-law." Razo-Leora and Norma Balderas lived together, and the jury was entitled to conclude that Balderas may have considered Razo-Leora his brother-in-law.

Norberto Castillo was the second Government witness the prosecution relied on to implicate Razo-Leora. Castillo was a drug dealer and a business associate of Razo-Leora's and Antonio Razo's. Castillo testified that before Garcia's murder, he heard or participated in a series of conversations about the possibility of murdering Garcia. The first occurred in Castillo's home with Razo-Leora, Antonio Razo and another man. Castillo heard Razo-Leora say that Garcia's death would serve as an example to others. In another conversation, Castillo heard Razo-Leora say that someone from Chicago was in charge of the Garcia business or was going to take care of it and that this person needed money badly and would do two jobs for the price of one. Castillo testified that this conversation took place at the end of November 1988.

At some later time, Antonio Razo came to Castillo's house looking for Razo-Leora to find out what they were going to do about Garcia as the date of Antonio's trial was quickly approaching. Still another conversation took place in a restaurant where Razo-Leora, Castillo, another man and possibly Antonio Razo were present. The issue of Garcia came up and Razo-Leora said in effect that when the right hand does something well, the left hand does not need to know about it. Castillo suggested they all forget about it.

8

Castillo further testified that Razo-Leora called him late one night several days before Garcia's murder. He told Castillo to find Eugenio Balderas to pick up some money. Castillo could not locate Balderas that night, and the next morning Razo-Leora gave Castillo Balderas's home address. At that time Razo-Leora told Castillo to help Balderas find Garcia's house. Castillo then met Balderas and they drove around looking for Garcia's house. Eventually, they located it. This drive took place either the weekend before or the weekend of Garcia's murder.

We disagree with Razo-Leora that the evidence demonstrates nothing more than his mere association with the conspirators or approval of the objectives of the conspiracy. The jury was entitled to find that Razo-Leora knew that Cabello had been hired to kill Garcia and supported that decision. The jury was also entitled to find that Razo-Leora assisted Balderas locate Garcia's home where the murder was to be committed. All of this evidence, when considered together, supports the jury's conclusion that Razo-Leora was a member of the conspiracy.

Razo-Leora attacks Castillo's testimony as unworthy of belief. He contends that Castillo changed his testimony to conform to facts given him by the Government, that his testimony conflicted with other testimony and that it was uncorroborated. The jury is the final arbiter of the credibility of a witness. **United States v. Birdsell**, 775 F.2d 645, 654 (5th Cir. 1985), <u>cert. denied</u>, 476 U.S. 1119, and <u>reh. denied</u>, 478 U.S. 1032 (1986). <u>See</u> <u>also</u> **Hindman v. City of Paris, Texas**, 746 F.2d 1063, 1068 (5th Cir. 1984). Razo-

9

Leora made essentially the same argument to the jury on Castillo's credibility that he makes to us. We will not disturb the jury's credibility findings.

Our review of the record persuades us that the evidence is sufficient to support Razo-Leora's conviction.

B.

As his next point of error, Razo-Leora complains of the district court's sentencing order that he make restitution in the amount of $100,000 to Garcia's widow. He challenges the adequacy of the factual basis of the order and asserts that he was not given proper notice that the Government would seek restitution against him.

We address the notice issue first. The record shows that the issue of restitution first arose a day or two before the sentencing hearing. The Presentence Report contained nothing on this issue. The attorney for the Government orally informed Razo-Leora's counsel that the prosecution would move to request restitution at the sentencing hearing. We cannot tell from the record whether defense counsel received this notice a day or so before the hearing or as late as the morning of the hearing.

The United States Supreme Court recently examined notice requirements for upward departures from the sentencing guidelines in **Burns v. United States**, 111 S.Ct. 2182 (1991). The Court held that a district court may not sua sponte upwardly depart on a ground not identified in the presentence report or a prehearing submission by the Government without giving the parties reasonable

10

notice that it is considering doing so. **Id**. at 2187. In **United States v. Mills**, 1992 U.S. App. LEXIS 6896 (5th Cir. April 14, 1992), however, this Circuit held that the **Burns** notice requirements do not apply where the defendant's term of confinement is not at issue. LEXIS pg. 6-7. Restitution is authorized by the guidelines and is not an upward departure, neither does it involve confinement. Although the notice received here was quite short, it was not per se inadequate.

Furthermore, we cannot say from this record that the notice received was so inadequate that it rendered fundamentally unfair the court's procedure for arriving at the restitution award. Nor has Razo-Leora demonstrated any concrete prejudice from the short notice. When the prosecution orally moved the court to consider making a restitution award, defense counsel pointed out that the Government had given him late notice of its intent to seek restitution. Counsel, however, did not specify when he received notice. Although counsel suggested that a hearing should be held, he did not advise the court what evidence he would adduce at such a hearing.[2] Accordingly, we cannot say that the late notice Razo-

---

[2]    Defense counsel made the following relevant statement to the court:

> First of all, Your Honor, with regard to the restitution. I know Mr. Clark gave it to us late.  There is no way, unless they had expert evidence as to loss of earnings for this gentleman who was a drug dealer.  I'm not sure that you're entitled under Texas law or Federal law to loss of earnings for loss of drug proceeds during the life of the 20 years or so that this individual, who was a known drug dealer was around.  I'm not even sure if

11

Leora received undermines the validity of the restitution award.

We also conclude that the evidence adequately supports the award.  The prosecution has the burden of demonstrating the amount of loss sustained by the victim and proving this loss by a preponderance of the evidence.  18 U.S.C. § 3664(d).  In this case, the prosecutor introduced a statement by Garcia's widow that Garcia would have legally earned $950,000 over the next twenty years.  Evidence at trial also reflected that, in addition to drug proceeds, Garcia received some income from a small trucking business and rent.  At the time of his death Garcia was in his twenties.  The $100,000 award to his widow is therefore relatively conservative and assumes legitimate income by Garcia of only $5000 per year with a work life expectancy of only twenty years.  Razo-Leora points to no countervailing evidence in the record.  We conclude that the award has adequate support.  See **United States v. Rochester**, 898 F.2d 971, 982 (5th Cir. 1990).

### III.

A.

---

he's entitled to any form of restitution in this type of case, or if just giving the Court a number would be adequate.  I think we'd have to have a hearing on it to determine the extent the amount, whether it's under law. Court can order restitution in this type of proceeding.  Would involve some conspiracy case, when we don't have any numbers to work with.  [Garcia's widow] could have pulled anything out of the air with regard to the amounts of money.

12

Eugenio Balderas challenges the validity of each of his five counts of conviction. First, he argues that the district court erred in instructing the jury on the perjury charge. Count 3 of the indictment alleged that Balderas made a false material declaration to a Grand Jury by stating that he did not provide the vehicle or the weapon used by Cabello the weekend of Garcia's murder. Balderas correctly points out that this count in the indictment charges him with making two distinct statements to the grand jury, one concerning the vehicle and the other the weapon.[3] Balderas complains that the court's instruction[4] did not require the jury to reach unanimity on each of the false statements.

[3] Balderas argues on appeal that this charge in the indictment was duplicitous--that is, that it charged more than one offense in violation of Fed. R. Crim. P. 8(a). Balderas did not raise this claim below. Failure to raise a claim of duplicity in the indictment prior to trial constitutes a waiver of the claim. **United States v. Baytank (Houston), Inc.**, 934 F.2d 599, 609 (5th Cir. 1991). Therefore, we address only his claim that the court failed to adequately instruct on this charge.

[4] The court's instruction on the perjury charge read as follows:

> So, to establish the offense proscribed by that statute, the government must prove each of the following elements beyond a reasonable doubt:
> First: That the testimony given, or the described record or document was used, while the defendant was under oath before the Grand Jury of this Court as charged;
> Second: That such testimony or such record or document, was false in one or more of the respects charged as to some material matter in such Grand Jury proceedings; and
> Third: That such false testimony, or record or document, was knowingly and willfully given or used by the defendant as charged.

Balderas also points out that half of the jury may have convicted him on the basis of his statement about the vehicle, while the other half may have convicted him on the weapon statement. He argues that this violates his right to a unanimous jury verdict.

In **United States v. Holley**, 942 F.2d 916 (5th Cir. 1991), we held that the failure to give a unanimity instruction as to each false statement in a perjury prosecution alleging multiple false statements was reversible error. **Holley** is distinguishable, however, because in that case the defense made a timely objection to the court's failure to give a unanimity instruction. Balderas made no such objection. We review a failure to give a special instruction on unanimity only under the narrow "plain error" standard. **United States v. Baytank (Houston), Inc.**, 934 F.2d 599, 609-10 (5th Cir. 1991). A plain error is one which is "so fundamental as to have resulted in a miscarriage of justice." **United States v. Yamin**, 868 F.2d 130, 132 (5th Cir. 1989) (citing **United States v. Hernandez-Palacios**, 838 F.2d 1346, 1350 (5th Cir. 1988)). The court's failure to include a unanimity instruction in this case does not rise to plain error.

B.

Balderas's second argument also concerns the district court's failure to give a unanimity instruction. Count 5 alleges that Balderas was carrying a firearm during the commission of either 1) the acts alleged in Count 1 (the conspiracy), or 2) the acts alleged in Count 2 (aiding and abetting). Evidence was introduced that Balderas had two different guns, the .357 magnum and a nine

14

millimeter pistol, during the course of events leading up to the murder. He argues that, because no specific unanimity charge was given, the jury may have convicted him on this charge even if they did not unanimously agree which gun he was carrying during the activities constituting either offense. As in the perjury count, Balderas did not object to the indictment or the instruction, nor did he request a specific unanimity charge. If the court committed error, which we do not decide, it does not rise to the level of plain error.

C.

Balderas next challenges the sufficiency of the evidence supporting all five counts on which he was convicted. Count 1, the conspiracy count, charged an agreement between Balderas, Razo-Leora and Cabello to travel in and use interstate commerce facilities in the commission of a murder for hire. We have discussed the law and evidence on this issue extensively in connection with Razo-Leora and will not repeat it in detail here. The evidence against Balderas was overwhelming. The jury was entitled to infer from the evidence that: Balderas asked Cabello to come from Chicago to Houston to murder Garcia; Balderas paid or offered to pay Cabello for his services; Balderas provided the weapon and automobile for Cabello to use in murdering Garcia. Balderas and others found Garcia's home. This evidence supports Balderas's convictions on Counts 1 (conspiracy), 2 (aiding and abetting)[5] and 4 (soliciting)[6].

_____

[5] Count 2 charged Balderas with aiding and abetting others in causing Cabello to travel to Houston to commit murder for hire. To prove this offense under 18 U.S.C. § 2, the Government must first

15

The jury was also entitled to conclude that Balderas lied to the grand jury when he denied providing the weapon or vehicle. Evidence that Balderas delivered the .357 magnum pistol to Cabello supports his conviction on Count 5 which charged him with carrying or using firearms in connection with and during the commission of Counts 1 and 2.[7] The evidence was sufficient to support Balderas's conviction on all counts.

Balderas contends that the Government was required to establish that he intended to use interstate commerce facilities in connection with Garcia's murder. The record evidence was sufficient to allow the jury to conclude that Balderas arranged with Cabello to come to Houston from Chicago to kill Garcia. The jury was not required to believe Cabello's description of the telephone arrangements Balderas made with Cabello to come to

---

demonstrate that the substantive offense occurred. **United States v. Hall**, 845 F.2d 1281, 1285 (5th Cir.), <u>cert. denied</u>, 488 U.S. 860 (1988). There is overwhelming evidence that Cabello traveled to Houston and murdered Garcia. In addition, the Government must show that 1) the defendant associated with a criminal venture, 2) he participated in the venture, and 3) he sought by action to make the venture succeed. **United States v. Medina**, 887 F.2d 528, 532 (5th Cir. 1989) (citation omitted).

[6]   Count 4 charged Balderas with soliciting Cabello to commit murder. To convict for solicitation under 18 U.S.C. § 373, the Government must prove that the defendant intended for another person to engage in conduct which violates Title 18, and that the defendant induced or tried to persuade that other person to commit the crime. **United States v. McNeill**, 887 F.2d 448, 450 (3rd Cir. 1989), <u>cert. denied</u>, 493 F.2d 1087 (1990); **United States v. Buckalew**, 859 F.2d 1052, 1053 (1st Cir. 1988).

[7]   Balderas also challenges his conviction on Count 5 on the ground that the Government did not sufficiently prove the underlying offenses. Because we have concluded that the evidence supported his convictions on these counts, this challenge also fails.

16

Houston to "rough somebody up."  Moreover, Balderas misunderstands the interstate travel requirement of 18 U.S.C. § 1958.  In **United States v. Edelman**, 873 F.2d 791, 794-95 (5th Cir. 1989) (examining predecessor statute to § 1958), this court made clear that travel in or use of interstate commerce facilities is a jurisdictional requirement only and that the Government need only prove specific intent to commit the underlying offense.  The evidence is sufficient to establish that Balderas specifically intended Garcia's murder.

## IV.

For the reasons stated above, we affirm the convictions and sentences of both Razo-Leora and Balderas.

AFFIRMED.