**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 96-40836

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

CHARLES RAY POLK,

Defendant-Appellee.

Appeal from the United States District Court
for the Eastern District of Texas

July 17, 1997

Before GARWOOD, BENAVIDES, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Charles Ray Polk, a car salesman for King Chevrolet in Tyler, Texas, boasted of having significant financial resources ($150 million) and the desire to blow up federal buildings and kill federal employees across the country—this despite the fact that Polk could hardly afford to pay his bills. A jury rejected Polk's argument that his "outlandish" suggestions were mere puffery, concluded that Polk was deadly serious, and convicted him of attempted use of a weapon of mass destruction (Count 1); solicitation to commit a crime of violence under 18 U.S.C. § 844(f) (Count 2); solicitation to commit a crime of violence under 18 U.S.C. § 1114 (Count 3); possession (carrying) of a firearm during a crime of violence (Count 4); unlawful possession of a machine gun (Count 5); and aiding and abetting the making of a false statement to a federally licensed firearms dealer (Count 6). Polk was sentenced to 249 months' imprisonment. He now appeals.

We affirm Polk's convictions on Counts 1, 2, 3, and 5 and reject Polk's claims of legal error. However, finding insufficient evidence, we reverse Polk's convictions on Counts 4 and 6 and remand this case to the district court for resentencing.

## BACKGROUND

In March 1995, a Texas state trooper informed a special agent of the ATF that Douglas Davidson (a CI known as "Big Dave") had contacted him and informed him that Polk had requested a quantity of plastic explosives and machine guns. Davidson stated that Polk needed the weapons to assassinate four police officers and a female judge. The ATF agent recalled that a year prior to Davidson's revelations, the agent had received an anonymous tip that Polk had made it known that he wanted to accumulate a cache of weapons and use them in an attack on the IRS in Tyler.

In early April 1995, an ATF agent interviewed Davidson about Polk. Davidson told the agent that he (Davidson) had purchased guns (ranging from pistols to semi-automatic weapons) for Polk at Polk's request. Between October 1994 and January 1995, Davidson purchased approximately 43 guns for Polk. Davidson also stated that on one occasion, Polk paid Davidson an extra $300 to have a semi-automatic rifle converted into a machine gun; asked him (Davidson) to obtain plastic explosives; and asked him (Davidson) to provide a group of men to ambush and shoot law enforcement officers that might survive an area Polk planned to booby trap with plastic explosives.

On April 6, 1995, Davidson introduced Jackie Grier (an undercover cop) to Polk. As they were speaking, Grier observed a shotgun in the front seat of Polk's vehicle. During their initial meeting, Polk asked for Grier's assistance in obtaining a large quantity of machine guns and explosives, including rocket propelled grenades and hand grenades. Polk told Grier that he was interested in purchasing 2,000 pounds of plastic explosives and detonators, that he would have $150 million to spend, and that he was responsible for procuring an arsenal of weapons for an organization dedicated to restoring the United States to its "common law roots." This organization, according to Polk, was planning a "massive offensive" during July 1995, an offensive that would include destroying (through the use of plastic explosives) several IRS buildings throughout the nation.

Polk met with Grier again two days later, on April 7, 1995. During that meeting, Polk provided Grier with a handwritten "wish list" of weapons and explosives he wanted Grier to acquire. The list included plastic explosives and detonators; one case of grenades; one pair of night-vision binoculars; one light tank anti-weapon system; one rocket-propelled grenade; and one light machine gun launcher.

Grier and Polk thereafter had a series of meetings, some by telephone, some in person. During these meetings, Polk again discussed purchasing weapons and explosives; Polk also spoke of the upcoming offensive. On June 24, 1995, Davidson called Polk and asked if they could meet. When Polk arrived at the meeting, Davidson informed him that he had located two individuals who would be willing to assist Polk in the planned bombings. Later that day, Polk, Davidson, undercover ATF agent Wendall Frost, and an undercover Tyler police officer met at a Tyler motel. Frost posed as a mercenary. During the meeting, Polk stated that he was third in command of an organization known as "Constitutional America." Polk reiterated his desire to destroy IRS buildings by using plastic explosives. Polk asserted that to bring each of these buildings down, four or five explosive charges must be set. Two-hundred pounds of explosives per building would, according to Polk, bring the buildings down; "I want them to the ground," Polk said. At this point, Polk also stated that he had no concern for the loss of human life.

Polk solicited Frost's help in hiring people to assist in the attacks. Polk thought that 50-100 persons would be needed and that each would be paid $20,000 and supplied with weapons. Polk stated that he needed people who knew how to use M-60 and Uzi machine guns and who "don't mind shooting people if they get in the way." Polk was asked whether he had any photographs of the targeted buildings, and he responded that the photos and layout would arrive later.

On June 29, 1995, Polk and Grier met at Polk's home and discussed Polk's failure to produce the necessary funds to obtain the weapons Polk sought. Polk stated that the money was not forthcoming because the Government had blocked the organization's funds. Polk then stated that he wanted to increase his original order. According to Polk, he now needed 1,200 pounds of plastic

explosives; 30 machine guns; 6 Uzi sub-machine guns; and 8 pairs of night goggles. While at Polk's home, Grier noticed two semi-automatic rifles, a .22 caliber pistol, and several cans of gunpowder commonly used in reloading ammunition. On July 14, 1995, Polk paged Grier several times. Grier called Polk and Polk wanted to know the prices for the plastic explosives and the machine guns.

On July 17, 1995, Polk, using the alias David Williams, deposited two rolls of film at a photo service in Tyler. The film contained 43 photographs of the exterior of the IRS building in Austin, Texas. On July 18, 1995, Grier called Polk and gave him the prices for the weapons and explosives. During the conversation, Polk asked Grier if he (Grier) was in possession of a gun belonging to Polk that was to be converted to fire fully automatic. Grier told Polk that the gun was being converted as requested.

Later that same day (July 18, 1995), Polk met with Frost at a Tyler motel. During the meeting, Polk provided Frost with photographs of the Austin IRS building. Frost asked Polk if he took the photos himself, and Polk replied that he had a friend in Austin take them. Polk told Frost that 3,500 people worked in the Austin building. Polk then began discussing the amount of explosives it would take to bring down the building. In doing so, Frost commented that a lot of people could die from the explosion. Polk replied, "Doesn't hurt my feelings." When Polk was then told that people would die who had nothing to do with the IRS, Polk replied, "Well, all I can say, gentlemen, is shit happens." Polk drew diagrams of the streets, a sketch of the building, and identified locations where the bombs should be placed. Polk told Frost that only two other people (the number one and two men in Constitutional America) knew of the plans, that these two individuals would help obtain the funds for the "project," and that the date of the "offensive" had been pushed back to September 1995.

Polk also produced a map of the United States and singled out other cities in which IRS buildings were located, buildings Polk wanted to bomb. Polk stated that these other buildings each contained 500-600 people. Polk eventually singled out nine buildings he wanted to bomb. Polk stated his primary aim was to "hit" the agents. At one point during the meeting, Polk commented that

4

he wanted to blow the buildings up early in the morning so that secretaries would not get hurt. When Frost told Polk that these bombings would provoke a nationwide investigation by federal law enforcement agencies, Polk discussed the possibility of bombing ATF and FBI offices as well. At the conclusion of the meeting, Frost asked Polk for some money to help with expenses. Polk stated that he was broke and that he was behind on his rent and bills.

July 28, 1995 is a date Polk most assuredly would rather forget. That day, he met with Grier at an abandoned car wash located just outside Tyler. Grier told Polk that his (Polk's) rifle could not be successfully converted into a machine gun. Polk was offered another machine gun in its place. After taking possession of the machine gun, Polk was arrested by tactical officers hidden within the abandoned car wash.

### PROCEDURAL HISTORY

On September 12, 1995, Polk was charged in a six-count superseding indictment[1] with violations of the following federal statutes: 18 U.S.C. § 2332a, attempted use of a weapon of mass destruction (Count 1); 18 U.S.C. § 373, solicitation to commit a crime of violence under § 844(f) (Count 2); 18 U.S.C. § 373, solicitation to commit a crime of violence under § 1114 (Count 3); 18 U.S.C. § 924(c)(1), possession of a firearm during a crime of violence (Count 4); 18 U.S.C. § 922(o)(1), unlawful possession of a machine gun (Count 5); and 18 U.S.C. § 922(a)(6), false statement to a licensee in the acquisition of a firearm, aiding and abetting (Count 6).

The district court denied Polk's motion to suppress evidence he claimed was obtained in violation of the Fourth Amendment and Polk's motions for judgment of acquittal (made after the Government presented its case and at the close of all the evidence). Polk was convicted on all six counts and sentenced to 249 months' imprisonment (20.75 years). Polk now challenges the convictions and the sentences imposed.

---

[1]On July 28, 1995, a criminal complaint was filed against Polk, charging him with violating 18 U.S.C. §§ 922(o) and 924(a)(2), possession of a machine gun. On August 1, 1995, Polk was named in a one-count indictment charging him with violating 18 U.S.C. § 922(o)(1), unlawful possession of a machine gun.

5

**DISCUSSION**

**I.    SUFFICIENCY OF THE EVIDENCE**

It is by now well settled that a defendant swims upstream in a sufficiency-of-the-evidence challenge. We view the evidence in the light most favorable to the verdict and indulge all reasonable inferences in favor of the verdict. United States v. McKinney, 53 F.3d 664, 672 (5th Cir.), cert. denied, 116 S. Ct. 261 (1995). The evidence must support a finding that the jury could have found the Government proved each element of each crime beyond a reasonable doubt. Id.

A.    Count 1—Attempted Use of a Weapon of Mass Destruction (18 U.S.C. § 2332a)

Count 1 of the indictment charged Polk with attempting to use a weapon of mass destruction against the IRS building in Austin. The crime of attempt requires the Government to prove that the defendant (1) intended to commit the underlying offense, and (2) took a "substantial step," beyond mere preparation, toward committing that crime. See United States v. Mandujano, 499 F.2d 370, 376 (5th Cir. 1974), cert. denied, 419 U.S. 1114 (1975). Liability for attempt attaches if the defendant's actions have proceeded to the point where, if not interrupted, would culminate in the commission of the underlying crime. Id. at 378.

The parties do not seriously dispute Polk's specific intent to blow up the IRS building in Austin. The parties do disagree, however, about whether Polk took the substantial steps necessary to support a conviction on Count 1. Polk argues that he did not take a substantial step toward destroying the Austin IRS building because he didn't have the money to purchase the weaponry necessary to do so. Polk asserts that even though he expressed "outlandish" ideas about blowing up the IRS building, he was never in any position to acquire the explosive materials because he had no money.[2] We reject these contentions because a reasonable jury could have concluded that Polk took substantial steps toward blowing up the IRS building in Austin.

---

[2]Polk contends he discussed blowing up the IRS building because he was entrapped. The jury, over the Government's objection, received an entrapment instruction. The jury apparently didn't believe Polk was entrapped. Polk does not challenge the validity of that instruction in this appeal.

6

We note at the outset that the record shows that throughout the investigation in this case, law enforcement officials became increasingly concerned that Polk was a dangerous person who would in fact carry out his plans unless he was prevented by law enforcement from doing so. The officers reached this conclusion based on Polk's alleged connection with persons unknown to law enforcement—individuals who the officers were led to believe had the resources to purchase explosives and other destructive weaponry.

With that said, there was more than enough evidence to support a finding that Polk was guilty of attempt. Polk sought the assistance of others to carry out his plans of destroying government property and killing and/or injuring federal employees; took or caused to be taken photographs of the IRS buildings; studied the IRS building to the point of indicating where bombs should be placed so that the building would be brought down; and initiated and participated in several meetings in which Polk "ordered" the materials necessary to carry out the planned bombing.[3] Just because Polk did not pony up the money to pay for the materials does not in any way alter the conclusion that a reasonable jury, under these facts, could have concluded that Polk is guilty of attempt. A reasonable jury could have concluded beyond a reasonable doubt that Polk's sinister plan of destruction and violence was merely temporarily derailed by a shortage of cash, but as soon as he made his connection with the right compatriots, he would have carried out his plan to bomb the targeted building.[4]

B.      Counts 2 and 3—Solicitation to Commit a Crime of Violence

Under Counts 2 and 3, Polk was charged with solicitation to (1) damage or destroy the Austin IRS building by means of an explosive device (Count 2), and (2) kill or attempt to kill persons at the same location by means of an explosive device (Count 3). The indictment stated that the alleged offense continued from April 4, 1995 through July 28, 1995. To obtain a conviction on Counts 2 and

_____

[3]Many of the meetings between Polk and law enforcement and Polk and Davidson were either tape recorded or videotaped. These recordings were played to the jury.

[4]The tone of Polk's argument in this appeal is that Polk should have done more before a jury could find that he took a substantial step toward commission of the offense. Polk is second-guessing the jury, who could have reasonably found that many of the actions taken by Polk went far enough.

7

3, the Government was required to prove that the defendant intended that another person violate Title 18, and that the defendant induced or "otherwise endeavor[ed] to persuade" the other person or persons to commit the underlying crime. See United States v. Razo-Leora, 961 F.2d 1140, 1148 n.6 (5th Cir. 1992). The phrase "otherwise endeavors to persuade" should cover those cases in which a defendant seriously seeks to persuade another to engage in criminal conduct. S. REP. NO. 97-307, 97th Cong., 1st Sess. 183-84 (1982).

Polk argues that the evidence was insufficient to support a conviction on Counts 2 and 3. According to Polk, "[h]e never had money to hire anyone. He made no arrangements to hire anyone. Mr. Polk's discussions of this subject were just vague plans that changed constantly." We conclude that under the facts of this case, a reasonable jury could have concluded beyond a reasonable doubt that Polk was guilty of the crimes charged.

Polk's suggestion that his conduct amounted to "vague plans" is another attempt to reweigh the same evidence the jury weighed in favor of the Government. The following evidence in the record supports the jury's findings of guilt: Polk instigated the process of obtaining weapons and explosives with Davidson; Polk provided Grier with a "wish list" of weaponry which was to be used to blow up the Austin IRS building and kill or injure persons within that building; Polk believed that undercover agent Frost had committed acts of terror in the past, discussed with Frost the "plan" to blow up the building and kill people, and stated that he (Polk) would conduct reconnaissance and determine the manpower needed;[5] and in Polk's second meeting with Frost, he (Polk) provided photos of the Austin IRS building, drew a diagram of it, and showed Frost the preferred locations of the explosive devices.

C.    Count 4—Carrying a Firearm During a Crime of Violence

Federal law makes it a crime to carry a firearm "during and in relation to" a crime of violence. See 18 U.S.C. § 924(c)(1) (emphasis added). It is well settled that to prove a violation of § 924(c)(1), the Government must prove two elements beyond a reasonable doubt: "First, the prosecution must demonstrate that the defendant . . . 'carrie[d] a firearm.' Second, it must prove that

---

[5]The meetings with Frost were videotaped. The jury was shown the videotape.

the . . . carrying was 'during and in relation to' a 'crime of violence or drug trafficking crime.'" Smith v. United States, 508 U.S. 223, 228 (1993). We deal here with the meaning of "in relation to."

In Smith v. United States, 508 U.S. 223, the Supreme Court broadly sketched the meaning of "in relation to" in § 924(c)(1). Recognizing that the phrase is "expansive," the Court nonetheless distinguished between a firearm that has some "purpose or effect" with respect to the crime of violence—in which case § 924(c)(1) liability would be triggered—and those situations in which the presence of a firearm is the result of "accident or coincidence"—in which case § 924(c)(1) liability would not be triggered. Id. at 237-38. The Smith Court found that the firearm must "facilitate or have the potential of facilitating" a crime of violence before § 924(c)(1) liability attaches. Id. at 238 (internal quotations omitted).

Of course, the Supreme Court's decision in Bailey v. United States, 116 S. Ct. 501 (1995), which defined "use," does not affect Smith or alter our understanding of "in relation to" in § 924(c)(1). Accordingly, we recently applied the Smith Court's definition of "in relation to" in United States v. Tolliver, ---- F.3d ---- (5th Cir. 1997) (on remand from the Supreme Court), where we found evidence sufficient to support the jury's conclusion that the defendant used a pistol in relation to a drug conspiracy. There, the evidence showed that at the time the defendant possessed the pistol (which was in his apartment), he was surrounded by drug records, a cache of assault weapons, and was in the presence of a co-conspirator. Id. at ----. Under these facts, we concluded that the defendant's use of the firearm was not accidental and that it was or could have been used to facilitate the drug conspiracy. Id. Similarly, in United States v. Branch, 91 F.3d 699 (5th Cir. 1996), cert. denied sub nom., Castillo v. United States, 117 S. Ct. 1466 (1997), and cert. denied, 117 S. Ct. 1467 (1997), we held that the "in relation to" prong of § 924(c)(1) was satisfied because the defendants' use of firearms "was not accidental; it was part and parcel of the conspiracy to murder federal agents." Id. at 736.

Here, the Government in Count 4 charged Polk with knowingly carrying a pump shotgun "in relation to" the crimes of violence alleged in Counts 1-3. Proof on this count consisted of the

9

presence of a shotgun in Polk's front seat during a meeting with Grier. At that meeting (which was tape recorded and played for the jury), Polk and Grier discussed the acquisition of plastic explosives and weaponry to be used to blow up IRS buildings across the country. However, because Counts 2 and 3 specify the Austin IRS building (and not IRS buildings around the country), the evidence at the Grier-Polk meeting provides evidentiary support only for the offense charged in Count 1. Indeed, there is no evidence suggesting that Polk discussed blowing up the Austin building at the meeting with Grier. Thus, the conviction on Count 4 sticks only if Polk carried the shotgun "in relation to" the crime of attempt charged in Count 1. We have reviewed the record and conclude that the Government failed to prove beyond a reasonable doubt that Polk carried the shotgun "in relation to" the crime of attempt.

Polk could not have carried a firearm in relation to the crime charged in Count 1 (attempt) because the Count 1 offense was not completed until after the date the Government claims Polk violated § 924(c)(1). Count 4 of the indictment charged Polk with carrying a pump shotgun during and relation to a crime of violence "on or about April 6, 1995." However, consistent with the position taken by the Government, we have concluded that the evidence sufficient to support Polk's conviction for attempt consisted of actions and events which took place well after April 6, 1995. As such, a reasonable jury could not have concluded that Polk carried the shotgun "in relation to" the crime of attempt because (1) that crime was not completed until after April 6, 1995, and (2) the Government failed to produce any evidence that Polk carried the shotgun at each step of the Count 1 offense.

D.      Count 5—Unlawful Possession of a Machine Gun

Polk next challenges the constitutionality of 18 U.S.C. § 922(o)(1), which criminalizes the possession of a machine gun, as an unconstitutional exercise of Congress's powers under the Commerce Clause. This argument, however, was dead on arrival, for after a spirited debate by our

10

en banc court (which failed to produce a decisive ruling on the issue),[6] we have since declared § 922(o)(1) constitutional.  See United States v. Knutson, 113 F.3d 27 (5th Cir. 1997).  Until the Supreme Court suggests otherwise, we are bound by Knutson.

    E.    Count 6—False Statement to a Licensee in the Acquisition of a Firearm, Aiding and Abetting

    Count 6 of the indictment charged Polk with aiding and abetting the purchase of a firearm through a false and fictitious statement.  In particular, the Government alleged that Polk purchased weapons from Liberty Sports through Davidson, a "straw purchaser."  Such purchases, argues the Government, violate 18 U.S.C. § 922(a)(6) because they involve the buyer making a false statement about the true purchaser of the weapon(s).

    Section 922(a)(6) provides in part as follows:

    (a) It shall be unlawful—

* * * * * * * * *

> (6) for any person in connection with the acquisition or attempted acquisition of any firearm . . . from a licensed dealer . . . knowingly to make any false or fictitious oral or written statement or to furnish or exhibit any false, fictitious, or misrepresented identification, intended or likely to deceive such . . . dealer . . . with respect to any fact material to the lawfulness of the sale . . . .

(Emphasis added.)  Thus, the Government had to prove beyond a reasonable doubt that (1) Liberty Sports was a licensed firearms dealer, (2) Davidson made a false statement in connection with the purchase of firearms, (3) Davidson knew the statement was false, and (4) the false statement was intended or likely to deceive Liberty Sports into believing that the firearms could be lawfully sold to Polk.

    A principal like Polk may be convicted on evidence that he aided and abetted the commission of the offense.  See United States v. Robles-Pantoja, 887 F.2d 1250, 1255 (5th Cir. 1989) (opinion of Garwood, J.).  To prove aiding and abetting, the Government had to show that Polk (1) associated

_____

[6]See United States v. Kirk, 70 F.3d 791 (5th Cir. 1995), aff'd by an equally divided court, 105 F.3d 997 (5th Cir. 1997) (en banc), petition for cert. filed, 65 U.S.L.W. 3756 (U.S. May 7, 1997) (No. 96-1759).  As we stated in United States v. Knutson, 113 F.3d 27 (5th Cir. 1997), decisions of an equally divided en banc court carry no precedential value.  Id. at 28.

11

himself with the criminal enterprise, (2) participated in the venture, and (3) sought by his actions to make the venture succeed. United States v. Mergerson, 4 F.3d 337, 341 (5th Cir. 1993), cert. denied, 114 S. Ct. 1310 (1994). "Association means that the defendant shared in the criminal intent of the principal. Participation means that the defendant engaged in some affirmative conduct designed to aid the venture." United States v. Colwell, 764 F.2d 1070, 1072 (5th Cir. 1985).

Polk argues that the evidence was insufficient to support a conviction on Count 6 because Davidson, and not Polk, made the false statements to the federally licensed firearms dealer. In addition, Polk argues that the transactions at Liberty Sports were not "straw purchases" because Polk had every right to purchase firearms (i.e., he was not an unlawful purchaser through Davidson). On the other hand, the Government argues that Davidson's purchases were "straw purchase" transactions because, notwithstanding the fact that Polk could lawfully purchase firearms, Davidson falsely informed a federally licensed firearms dealer that he was the true purchaser of the weapons.

We find that the Government's construction of § 922(a)(6) sweeps too broadly so that the evidence is insufficient to support a conviction on Count 6.[7] Although § 922(a)(6) on its face does not prohibit "straw purchases," we have nonetheless held that such transactions violate § 922(a)(6). See, e.g., United States v. Ortiz-Loya, 777 F.2d 973, 979 (5th Cir. 1985). It is clear to us—indeed, the plain language of the statute compels the conclusion—that § 922(a)(6) criminalizes false statements that are intended to deceive federal firearms dealers with respect to facts material to the "lawfulness of the sale" of firearms. (Emphasis added.) Thus, if the true purchaser can lawfully purchase a firearm directly, § 922(a)(6) liability (under a "straw purchase" theory) does not attach.

---

[7]We note a marked difference in the "straw purchase" warning on the reverse side of the August 1994 version of ATF Form 4473 and the April 1991 version of that same form. The April 1991 warning states that a "straw purchase" may violate federal firearms laws if the licensee knows and has reasonable cause to believe that the true purchaser of the firearm(s) is "ineligible" to make that purchase directly. By contrast, the August 1994 version of Form 4473 significantly broadens the definition of "straw purchase" transactions: "A 'straw purchase' occurs when the actual buyer uses another person (the straw purchaser) to execute ATF Form 4473 purporting to show that the straw purchaser is the actual buyer." See, e.g., United States v. Moore, 84 F.3d 1567, 1571 (9th Cir. 1996) (noting the different interpretations of illegal "straw purchase" transactions), on rehearing en banc, 109 F.3d 1456 (9th Cir. 1997) (en banc).

12

See, e.g., Barrett v. United States, 423 U.S. 212, 220, 96 S.Ct. 498, 503, 46 L.Ed.2d 450 (1976) (holding that purpose of § 922(a)(6) was "'to make it possible to keep firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency'" (quoting S.Rep. No. 1501, 90th Cong., 2d Sess. 22 (1968) U.S. Code Cong. & Admin. News 1968 p. 4410)); United States v. Moore, 109 F.3d 1456, 1460-61 (9th Cir. 1997) (en banc), petition for cert. filed, ---- U.S.L.W. ---- (U.S. June 2, 1997) (No. 96-9227); United States v. White, 451 F.2d 696, 699 (5th Cir. 1971) ("One goal sought by Congress [through § 922(a)(6)] was control over the ease with which criminals may acquire firearms."), cert. denied, 405 U.S. 998, 92 S.Ct. 1268, 31 L.Ed.2d 468 (1972).[8]

Here, it is undisputed that Polk could have lawfully purchased firearms from Liberty Sports, that CI Davidson was in the "business" of buying and selling firearms, that Davidson did not purchase weapons solely for Polk, and that Polk's participation in the alleged crime consisted of nothing more than a request to purchase firearms. Under these facts, we find that no reasonable jury could have convicted Polk beyond a reasonable doubt for aiding and abetting a violation of § 922(a)(6).[9]

F.      Summary

We affirm Polk's convictions on Counts 1, 2, and 3 because we find that a reasonable jury could have found Polk guilty on those counts beyond a reasonable doubt. We also affirm Polk's conviction on Count 5 because § 922(o)(1) is a valid exercise of congressional power under the

---

[8]We have held that the mere making of a false statement on ATF form 4473 triggers § 922(a)(6) liability. See United States v. Schmitt, 748 F.2d 249, 253 (5th Cir. 1984), cert. denied, 471 U.S. 1104, 105 S.Ct. 2333, 85 L.Ed.2d 850 (1985); United States v. Frazier, 547 F.2d 272, 274 (5th Cir. 1977); United States v. White, 451 F.2d at 699-700. However, these cases do not compel a different result here because in each of those cases, the person signing the form was a convicted felon and lied about that fact. In other words, the defendants' failure to state that they were convicted felons made the sale unlawful. By contrast, in this case, it is undisputed that CI Davidson could have lawfully purchased weapons from a federally licensed firearms dealer.

[9]The facts of this case are a far cry from those in Ortiz-Loya, 777 F.2d 973. There, we affirmed an aiding and abetting conviction because the evidence showed that the defendant (1) instigated the entire transaction; (2) provided up-front money for the purchase; and (3) because he did not have a Texas drivers' license (the defendant left it in Mexico), asked others to accompany him to sign the ATF forms. Id. at 981.

Commerce Clause. However, finding insufficient evidence to support Polk's convictions on Counts 4 and 6, we vacate those judgments of conviction.

## II. THE DISTRICT COURT PROPERLY DENIED POLK'S MOTION TO SUPPRESS BECAUSE THE SEARCHES OF HIS RESIDENCE AND BRIEFCASE WERE CONDUCTED PURSUANT TO VALID SEARCH WARRANTS

We review denials of a motion to suppress under the clearly erroneous standard. United States v. Howard, 106 F.3d 70, 73 (5th Cir. 1997). We review de novo the district court's conclusions of law. United States v. Alvarez, 6 F.3d 287, 289 (5th Cir. 1993), cert. denied, 114 S. Ct. 1384 (1994). And we view the evidence in the light most favorable to the prevailing party—in this case the Government—and indulge all inferences in favor of the district court's denial of the motion to suppress. Howard, 106 F.3d at 73.

Polk argues that the search warrants issued to search his residence and briefcase violated the Fourth Amendment because they were obtained on the basis of false information in the sworn-out affidavits which were presented to two different magistrates. Polk points to the following two problems with the affidavits: (1) the affidavits stated that Davidson purchased "150 firearms" for Polk, when the actual number was 68; and (2) the affidavits did not establish the credibility and reliability of Davidson (the CI). Polk's arguments are without merit.

Polk does not dispute that the affidavits were 30-pages long and contained a number of facts and details which established that, under the totality of the circumstances, probable cause existed to search Polk's residence and briefcase. Most importantly, however, the parties stipulated at trial that if the objectionable information was excised from the affidavits, the fruits of the search should be suppressed only if the warrant application did not amount to a showing of probable cause. The warrant application was submitted to Judge Justice and he concluded as follows:

> Law enforcement officials conducted an extensive undercover operation, and the affiant reviewed numerous videotapes and audiotapes of conversations between the defendant and undercover agents. The affiant's description of these encounters is itself a sufficient basis for probable cause. Thus, even if the statements challenged by the defendant were removed from the warrant, . . even if every sentence mentioning the confidential informant were taken out of the affidavit, the magistrate judge would still have been justified in determining that probable cause existed.

(Emphasis added). Polk does not present any persuasive argument (and we do not perceive one) that, under the circumstances of this case, the district court's findings amounted to error.

**III.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN OVERRULING POLK'S OBJECTIONS TO THE ADMISSION OF RELEVANT EVIDENCE**

We review a district court's evidentiary rulings for an abuse of discretion. United States v. Gadison, 8 F.3d 186, 192 (5th Cir. 1993). The exclusion of evidence under FRE 403 "should occur only sparingly." United States v. West, 22 F.3d 586, 597 (5th Cir.), cert. denied, 513 U.S. 1020, 115 S.Ct. 584, 130 L.Ed.2d 498 (1994).

Polk objected to the introduction of evidence about the destructive nature of plastic explosives and other weapons Polk sought to obtain. Polk argues that this evidence was inflammatory to the extent that the jury convicted Polk because he had a bad character, a propensity to commit crimes, and on the basis of extrinsic evidence. Polk also objected to evidence about the number of people who worked in the IRS building in Austin, the hours of occupancy, the number of blind and handicapped persons who worked there, and the effect of a bomb blast on a person. Polk asserts that this evidence was unfairly prejudicial because a bomb blast never occurred and that how many people would die and the manner of their death was not relevant to any fact issue. We reject Polk's arguments.

The evidence relating to the weapons and explosives was introduced via undercover discussions with Polk. These discussions centered on Polk's "wish list" and his intent to obtain the weapons to commit the offenses that were charged in the indictment. The weapons that were the subject of the testimony were part of the offenses charged, and not evidence of other crimes. Moreover, evidence of the weapons' capabilities was necessary to aid the jury in determining whether those weapons were weapons of mass destruction. And the evidence about the "killing potential" was necessary because the charges in the indictment required a showing that the weapons Polk sought were capable of killing someone. The district court did not abuse its discretion in admitting the evidence.

15

**IV.** **THE DISTRICT COURT PROPERLY APPLIED THE SENTENCING GUIDELINES TO THE FACTS OF THIS CASE**

Finally, Polk argues that the district court improperly increased his sentence for victim-related adjustments pursuant to USSG § 3A1.2, which mandates a three-level increase in the base offense level if the victim is a government employee and the defendant was motivated to commit the offense because of that status. Polk argues that there are no identifiable victims because no person directly received a threat and that the facts of this case at best support the conclusion that only general threats toward the Government were made. We reject Polk's contentions.

When reviewing a sentence imposed under the Guidelines, we must determine whether the district court inappropriately applied the Guidelines or imposed a sentence outside the range of the applicable guideline so as to render the sentence unreasonable. United States v. Ashburn, 38 F.3d 803, 806 (5th Cir. 1994), cert. denied, 115 S. Ct. 1969 (1995). The district court's application of the Guidelines is reviewed de novo, and findings of fact are reviewed for clear error. United States v. Mimms, 43 F.3d 217, 220 (5th Cir. 1995). We accord deference to the district court's application of the Guidelines to the facts of the case. United States v. West, 58 F.3d 133, 137 (5th Cir. 1995).

USSG § 3A1.2 mandates a three-level increase in Polk's base offense level if "(a) the victim was a government officer or employee . . . and the offense of conviction was motivated by such status." The district court rejected Polk's argument , reasoning as follows: "It is the belief of the Court that the defendant's term of imprisonment reflects the serious nature of the criminal conduct of which he has been convicted by the jury, and the potential number of victims of the offense and the potential disruption of government services." Pursuant to the recommendation in the Pre-Sentencing Report, the district court did not believe that USSG § 3A1.2(a) required particular persons to in fact be killed or injured to merit the three-level increase in the base offense level.

The district court's legal conclusion was correct, and its application of the law to the facts did not amount to clear error. Both the district court and the Government were careful to limit their Guideline-enhancement argument to Polk's convictions on Counts 1-3—convictions we have upheld. As such, our reversal on Counts 4 and 6 does not in any way impact our analysis of this issue. Based

16

on the evidence presented to the jury, there can be no doubt that Polk intended to kill, injure, or maim federal employees in the Austin IRS Service Center solely because those persons worked for the IRS. Just because federal IRS employees at the Austin Center were not killed or injured or that Polk did not know the names of his intended victims does not preclude application of the three-level enhancement. See, e.g., United States v. Branch, 91 F.3d at 741 (finding that knowledge of official status sufficient to trigger application of USSG § 3A1.2); United States v. McCaleb, 908 F.2d 176, 179 (7th Cir. 1990) ("Nothing in . . . the guidelines requires that the victim be harmed or made aware of [a] threat.").[10]

## CONCLUSION

Because we find the evidence sufficient to support the convictions on Counts 1, 2, and 3, those judgments of conviction are affirmed. Similarly, finding that § 922(o)(1) is a constitutional exercise of Congress's powers under the Commerce Clause, Polk's conviction on Count 5 is also affirmed. And because we find no legal error, the district court's denial of Polk's motion to suppress, introduction of relevant evidence, and upward departure from the Sentencing Guidelines are affirmed. However, the evidence was insufficient to support Polk's convictions on Counts 4 and 6, and we therefore reverse those judgments of conviction and remand this case to the district court for resentencing.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

ENDRECORD

---

[10]Application note 1 to USSG § 3A1.2 states that "this Guideline applies when specified individuals are victims of the offense. This Guideline does not apply when the only victim is an organization, agency or the government." (Emphasis added.) Contrary to Polk's suggestion, we do not read the emphasized language to require federal employees to be named for the three-level enhancement to apply. Nor do we agree with Polk's contention that he only targeted "an organization, agency or the government." As we have noted above, the record contains an abundance of evidence suggesting that Polk intended to kill or injure federal employees who work in the IRS Center in Austin. We find these intended persons to be "specifi[c] individuals" and reject the notion that Polk intended to harm the IRS qua IRS.

GARWOOD, Circuit Judge, specially concurring:

I concur in all of Judge Stewart's fine opinion, and issue this separate writing only to reflect my continued adherence to the views expressed in Judge Jones' opinion in *United States v. Kirk*, 105 F.3d 997, 1005 (5th Cir. 1997) (en banc), *pet. for cert. filed*, 65 U.S.L.W. 3756 (U.S. May 7, 1997).  However, as Judge Stewart correctly points out, this panel is bound by *United States v. Knutson*, 113 F.3d 27 (5th Cir. 1997).