[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-11655

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 14, 2010
JOHN LEY
CLERK

D. C. Docket No. 07-20585-CR-JLK

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LARON FRAZIER,

Defendant-Appellant.

_____

No. 08-12136

_____

D. C. Docket No. 07-20585-CR-JLK

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

GARY BERTRAM ROACH,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(May 14, 2010)

Before EDMONDSON, BLACK and SILER,[*] Circuit Judges.

SILER, Circuit Judge:

In this consolidated criminal case, Laron Frazier appeals his convictions for making false statements to a firearms dealer in connection with the acquisition of firearms in violation of 18 U.S.C. § 922(a)(6), counts 4 and 6, and exporting firearms in violation of 18 U.S.C. § 554, count 17, and argues that his convictions were not supported by sufficient evidence. Gary Bertram Roach appeals his conviction for conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and (h), count 14, also on the basis that his conviction was not supported by sufficient evidence. Roach further appeals his sentence of 135 months of imprisonment and argues that his advisory Guidelines sentencing range was improperly calculated by the district court. We AFFIRM Frazier's and Roach's convictions as supported by sufficient evidence. Because we find that Roach's advisory Guidelines range were

_____

[*]Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

2

improperly calculated, we REVERSE his sentence and REMAND to the district court for resentencing.

## BACKGROUND[1]

### A.    Introduction

Beginning in 2006, Frazier and Roach became involved in a firearms smuggling operation from the United States to Canada. Frazier and Roach would buy, or have someone else buy, firearms in the United States and hire drivers to deliver the firearms in rental cars to Canada and exchange the firearms for drugs or money, which were transported back to the United States.

After indictment and trial, a jury found Frazier guilty of seven counts and found Roach guilty of ten counts of the indictment. Frazier was sentenced to 180 months of imprisonment and Roach was sentenced to 135 months of imprisonment.

Frazier appeals the sufficiency of the evidence supporting his convictions for two counts of aiding and abetting the making of false statements in connection with the purchase of a firearm, and also his conviction for exporting firearms. Roach appeals his sentence and the sufficiency of the evidence supporting his conviction for money laundering.

---

[1]We limit our discussion of the facts to those relevant to this appeal, including facts related to counts 4, 6, 14, and 17 of the indictment, and facts related to Roach's sentence.

3

**B.** **Aiding and Abetting False Statements in Connection with the Acquisition of Firearms Counts Against Frazier**

In September 2006, Frazier purchased four handguns at Pantera Guns & Guitars ("Pantera") in Miami, Florida. The owner of Pantera, Sean Gilley, testified that Frazier was a prior customer whom he had dealt with on several occasions.

Later that month Frazier returned to Pantera, this time accompanied by Cassandra Davis. Frazier gave Davis the money to purchase the firearms, told her what to say, and instructed her to explain that she was purchasing the guns as gifts. Davis ordered the same firearm models that Frazier had purchased from Pantera earlier that month. She filled out Alcohol, Tobacco, Firearms, and Explosives ("ATF") Form 4473 and affirmed that she was the "actual buyer" of the firearms. Due to a waiting period, Davis picked up the firearms from Pantera two days later and took them to Frazier's warehouse. Frazier instructed Davis that if she was ever asked what happened to the firearms, she should say they were stolen. Frazier paid Davis $1500 for her services.

Because Davis purchased more than one handgun within a five-day period, Gilley was required to report the purchase to the ATF. Gilley also reported that Davis's purchase was similar to Frazier's purchase made earlier that month. On September 29, 2006, ATF agents contacted Davis about her purchase. She initially

told the ATF agents that they were given as gifts, but eventually showed Special Agent Bryan Miller the warehouse where she delivered the firearms and admitted that they were purchased for Frazier.

In January 2007, Frazier informed Gilley that someone was interested in purchasing M-11 or M-12 handguns and inquired into their availability. Although not accompanied by Frazier, Welline Lubin entered Pantera and purchased a Kel-Tec P-32 handgun. The next day, Frazier told Gilley that Lubin had not picked up the firearms she wanted and would return to the store to purchase an M-11 and an M-12. Lubin arrived at Pantera in a pickup truck registered to a business owned by Frazier and was accompanied by Nedson Jeanovil. While in Pantera, Jeanovil received a call from Frazier on his cell phone and handed the phone to Gilley. Frazier inquired as to whether Gilley had an M-11 or M-12 in stock. Lubin then paid for one M-11 and one M-12, but was required to wait to pick the firearms up. Lubin filled out ATF Form 4473 and indicated that she was not the actual buyer of the firearms. Upon Lubin's subsequent return to pick up the firearms, Gilley noticed the mistake on ATF Form 4473 and Lubin amended the form to indicate that she was the actual buyer. At that time, Jeanovil took possession of all three firearms.

**C.     Exporting Firearms Count Against Frazier**

Serena Clark testified that from September through November 2006, she purchased numerous firearms on behalf of Frazier and Roach. Frazier or Roach would wire money to Clark's "wire plastic card," which she would use to purchase the firearms. Although Clark had more contact with Frazier, she usually received instructions from Roach, while Frazier ensured that she was paid. Frazier and Roach usually had someone pick up the firearms from Clark's house, but Clark also delivered firearms to Roach in person.

Clark transported firearms to Canada for Frazier and Roach. On two occasions she transported firearms from Alabama to Canada at Roach's request, in return for $1000 per trip. Frazier told her she was transporting guns to Canada for resale because Canadians could not easily obtain guns.

Before her first trip to Canada, Roach picked up Clark's Oldsmobile and returned it an hour later. When she arrived in Canada, she notified Roach who sent Rodney Glouden, a Canadian firearms purchaser, to pick up the car. Clark also called Frazier to inform him that she had arrived in Canada. Clark left the vehicle in Canada and took a plane home to Alabama, where Frazier and Roach paid for her use of a rental car.

In December 2006, Clark made her second trip to Canada. Frazier told her the purpose of the trip was to deliver some more "goods" to Canada, which, Frazier

6

explained to her, consisted of taking the guns that were purchased in the United States to Canada to be resold. On her second trip, Clark drove a grey Nissan rental car that she paid for with money that Frazier and Roach had wired to her. Before she left, Roach picked up the Nissan for about an hour. After it was returned, Clark drove to Canada and once again met with Gloudon. Clark left the Nissan with Gloudon and drove her Oldsmobile home to Alabama. Later that month, Frazier was observed at Gloudon's Canadian residence driving the Nissan and was stopped by Toronto police, but was not arrested at that time.

Daniel Christie, one of Roach's Canadian contacts, testified at trial. Roach would instruct someone to drive a rental car containing firearms to Christie in Canada, and Christie would remove the firearms and place marijuana or ecstacy in the car to be returned to Roach. In Canada, Christie sold several firearms to Glouden.

### D. Conspiracy to Commit Money Laundering Count Against Roach

In 2007, Roach hired Tashana Watts, a resident of Canada, to drive to and from Canada on his behalf. Roach would wire her money, which she would use to rent cars to drive to the United States. On three occasions, Watts rented a car in Canada and drove to Alabama at Roach's direction. Generally, Watts would meet with Roach and Roach's associate, Geocobi "Cobi" Nnadi, whereby Roach would take possession of Watts's rental car, remove any drugs that may have been sent from Canada, place

7

firearms in the dashboard or door panels, and return the car to Watts. Watts would then drive the car back to Canada where a contact, such as her sister, would take possession of the car and drive it to an undisclosed location. Roach paid Watts approximately $1500 for each trip.

In May 2007, Watts rented a Toyota in Canada and drove to Alabama, and left the Toyota with Nnadi and Roach. Roach removed the door panels of the Toyota and retrieved several packages of marijuana and ecstacy. He replaced the drugs with firearms that Nnadi had picked up on Roach's behalf. Roach then asked Watts to drive the Toyota to Miami in exchange for more than her usual $1500 fee. Watts agreed and drove to Miami where she met Roach and Frazier.

In Miami, Roach called Nnadi in Alabama and asked him to obtain money from an "associate" of his and wire it to Watts in Miami. Nnadi complied, met with Roach's associate to pick up the money, and then wired it to Watts in Miami based on personal information that Roach obtained from Watts. Roach and Watts went to a grocery store to receive the wired money. She received $900, $100 of which she returned to Roach. The next day, Watts drove from Miami to Canada where she was stopped by Canadian officers. The officers discovered firearms and cocaine in the panels of the Toyota and arrested Watts. Roach was recorded via a wiretap discussing with Glouden the arrest of Watts.

8

### E.    Procedure and Trial

After indictment, Jeanovil pled guilty to his involvement in the case and Frazier and Roach proceeded to trial.  The district court granted a judgment of acquittal as to count 18 of the indictment, but denied it as to all other counts.  A jury found Frazier guilty of seven counts and Roach guilty of ten counts.

Frazier appeals his convictions as to counts 4, 6, and 17, two counts of violating 18 U.S.C. §§ 922(a)(6) and 2, and one count of violating § 554, respectively, by challenging the sufficiency of the evidence to support his conviction. Roach appeals his conviction as to count 14, violating 18 U.S.C. § 1956(a) and § 2, also on the basis of insufficient evidence.

### F.    Roach's Sentencing Hearing

At Roach's sentencing hearing on March 27, 2008, the district court sustained several of Roach's objections to his Presentence Investigation Report ("PSI"). Based on the rulings, the probation officer recalculated Roach's base offense level, but erroneously informed the court that Roach's total offense level was 31.[2]  Under this calculation, Roach's recommended sentencing Guidelines range was 108 to 135 months of imprisonment.  Based, in part, on the erroneously calculated offense level,

---

[2]The sentencing transcript and amended PSI indicate that the probation officer correctly calculated the base offense level and the enhancements under the Guidelines, but merely mis-added the sum of the total offense level as 31 instead of 30.

the district court sentenced Roach to 135 months on counts 14, 15, 16, to run concurrently with sentences of 120 and 60 months that he received on the other counts.

During the sentencing hearing, the court informed Roach that he had ten days to appeal from the judgment against him and asked if there were any further motions. Roach's attorney, Theodore Mastos, informed the court that he intended to withdraw and that Roach needed a court-appointed attorney to conduct his appeal. The court stated that a "Tjoflat" hearing would be conducted by a magistrate judge to determine whether Mastos could withdraw and informed Roach that it would take a number of days before the magistrate judge could conduct the hearing. The court then stated that Roach would have ten days from the magistrate's ruling on the motion to withdraw to file his notice of appeal. Mastos submitted a written motion to withdraw later that day.

On April 4, 2008, seven days after the sentence was entered, the government filed a notice pursuant to Federal Rule of Criminal Procedure 35(a), stating that Roach's offense level had been miscalculated at the sentencing hearing. The government claimed that Roach's correct offense level was 30, instead of 31. Under this calculation, Roach's Guidelines range would have been 97 to 121 months, instead of 108 to 135 months.

On April 17, 2008, a magistrate judge granted Mastos's motion to withdraw. Neal Gary Rosensweig was appointed as counsel for Roach that same day. On April 18, 2008, Rosensweig filed a motion for an extension of time for Roach to file the appeal pursuant to Federal Rule of Appellate Procedure 4(b) and also filed a notice of appeal.

On May 2, 2008, the district court denied Roach's motion for extension of time to file the appeal. The order stated, "[t]he Court cannot be responsible for failure of counsel to file a Notice of Appeal, and the acquisition of new counsel on April 17, 2008, after the deadline to file a Notice of Appeal had passed, has no bearing on the time limit to file the Notice of Appeal."

Roach argues that his appeal was timely because he relied on an oral order of the court granting him an extension to file the appeal until ten days after his new counsel was appointed. In its appellate brief, the government originally objected to Roach's notice of appeal as untimely, but has now withdrawn its objection. Roach claims, that if this court has jurisdiction, the district court committed plain error in miscalculating his sentencing Guidelines range.

## DISCUSSION

**I.  Jurisdiction to hear Roach's Appeal**

Federal Rule of Appellate Procedure 4(b)(1) requires a defendant to file a notice of appeal within ten days after the entry of the judgment of conviction, and Rule 4(b)(4) allows a district court to extend the deadline up to thirty days if it finds excusable neglect or good cause. Since "the deadline in Rule 4(b) for criminal defendants is not jurisdictional," United States v. Lopez, 562 F.3d 1309, 1313 (11th Cir. 2009), an objection to an untimely notice of appeal in a criminal case may be forfeited, see id. at 1314. Here, although Roach filed his notice of appeal on April 18, 2008, some eleven days past the filing deadline, the government voluntarily forfeited its objection to the untimeliness of Roach's notice of appeal by withdrawing its objection. Therefore, we have jurisdiction to hear his appeal. Thus, we do not need to discuss whether the district court's oral order at sentencing constituted an extension of the time to file the notice of appeal, or whether it abused its discretion in later declining to extend the time for filing the notice under Rule 4(b)(4).

## II.     Sufficiency of the Evidence Arguments

### *1.     Standard of Review*

Frazier and Roach both challenge the sufficiency of the evidence supporting their convictions. The sufficiency of evidence presented at trial to support a criminal conviction is a question of law reviewed de novo. United States v. Diaz, 248 F.3d 1065, 1084 (11th Cir. 2001) (citing United States v. Keller, 916 F.2d 628, 633 (11th

Cir.1990)). In evaluating the sufficiency of the evidence, we "view the evidence in the light most favorable to the government, with all reasonable inferences and credibility choices made in the government's favor." United States v. Martinez, 83 F.3d 371, 374 (11th Cir. 1996).

> 2. *Frazier's Convictions for Two Counts of Aiding and Abetting the Making of False Statements to a Firearms Dealer*

Frazier argues that there was insufficient evidence to support his convictions for aiding and abetting making false statements to a firearms dealer in connection with the acquisition of firearms in violation of 18 U.S.C. §§ 922(a)(6) and 2. Specifically, he argues that the false statements made by Davis and Lubin on ATF Form 4473 were not material to the lawfulness of the sale of the firearm and, therefore, there was no violation of § 922(a)(6).[3]

For a conviction under § 922(a)(6), the government must prove that: "(1) the defendant knowingly made; (2) a false or fictitious written [or oral] statement in connection with the purchase of firearms; (3) intended to deceive or likely to deceive a licensed firearms dealer; (4) and the false statement was a fact material to the lawfulness of the sale or disposition of the firearm." Ortiz, 318 F.3d at 1036. "To

---

[3]Frazier also argues that there was insufficient evidence that Lubine was purchasing the firearms on his behalf. This argument is meritless, as the circumstantial evidence that Lubine was acting on his behalf was overwhelming. See United States v. Ortiz, 318 F.3d 1030, 1037 & n.14 (11th Cir. 2003).

13

prove guilt under a theory of aiding and abetting, the Government must prove: (1) the substantive offense was committed by someone; (2) the defendant committed an act which contributed to and furthered the offense; and (3) the defendant intended to aid in its commission." United States v. Camacho, 233 F.3d 1308, 1317 (11th Cir. 2000).

Both parties agree that § 922(a)(6) is violated when "an unlawful purchaser . . . uses a lawful 'straw man' purchaser . . . to obtain a firearm." Ortiz, 318 F.3d at 1037. However, Frazier argues that § 922(a)(6) was not violated because he was eligible as a lawful purchaser to purchase firearms, and Davis and Lubin, acting as his agents, were also lawful purchasers.

Frazier's argument is based on a theory made popular in a Fifth Circuit case, United States v. Polk, 118 F.3d 286 (5th Cir. 1997). In Polk, the defendant directed a "straw purchaser" to buy several firearms on his behalf. Id. at 295. In Polk, as here, a "straw purchaser" falsely indicated that he was the "actual buyer" of the firearms, when in reality he was purchasing the firearm on behalf of the defendant. Id. at 289-90. However, the court reversed Polk's conviction and held that § 922(a)(6) was not violated because both the defendant and his "straw purchaser" were eligible to purchase the firearms legally. Id. at 296. Thus, the court reasoned, the false statement the "straw purchaser" made to the firearms dealer was not a false statement of a fact "material to the '*lawfulness of the sale*' of firearms" and, therefore, there was

14

no liability under § 922(a)(6). Id. at 295. The court noted that liability under a "straw purchaser" theory only attaches if either the actual purchaser, id. at 295, or the "straw purchaser," id. at 295 n.8, is ineligible to purchase firearms.

Thus, the issue becomes whether Frazier's aiding in the falsification of the identity of the "actual purchaser" statement of Form 4473 was material to the lawfulness of the sale of the firearm since he could have lawfully purchased the firearms himself. We find that the falsification was material to the lawfulness of the sale. "Whether the identity of the purchaser is a fact material to the lawfulness of the transaction (that is, whether the lawfulness of a firearms sale can hinge on the identity of the purchaser) is purely a question of law." United States v. Klais, 68 F.3d 1282, 1283 (11th Cir.1995). We review issues of law de novo. See United States v. Kelly, 888 F.2d 732, 739 (11th Cir. 1989).

Decisions in other circuits have indicated that false statements regarding addresses, names, and other information are misrepresentations material to the lawfulness of the sale of firearms under § 922(a)(6). See United States v. Queen, 408 F.3d 337, 339 (7th Cir. 2005) (holding that lying about a street address on Form 4473 was a material misrepresentation that violated § 922(a)(6)); United States v. Crandall, 453 F.2d 1216, 1217 (1st Cir. 1972) (holding that misrepresentation of one's name, age, and place of residence was material to the lawfulness of a sale). Likewise,

15

giving a fictitious address on Form 4473 is a violation of § 922(a)(6) even if the purchaser is a resident of the state where he purchased the firearm. See United States v. Grudger, 472 F.2d 566, 567-68 (5th Cir. 1972) (upholding the conviction of a Florida resident under § 922(a)(6) for listing a fictitious Miami Beach address in connection with the purchase of a firearm).[4]

Grudger notes that § 922(b)(5) makes a sale unlawful unless the seller records the name, age, and place of residence of the purchaser. Id. at 568. Thus, when the defendant listed a false address, he violated § 922(a)(6) because his misrepresentation was material to the lawfulness of the sale. Id. Likewise, in the instant case, Davis and Lubin falsified the name of the purchaser of the firearms when they represented themselves as being the actual buyers. This action was in violation of § 922(b)(5) because it caused Gilley to record the incorrect name of the buyer. Correspondingly, the misrepresentation also made the sale unlawful under § 922(a)(6). See Ortiz, 318 F.3d at 1038-39 (stressing the importance of the "actual buyer" requirement in Form 4473).

Therefore, we find the act of falsifying the identity of the "actual buyer" on Form 4473 to be a violation of § 922(a)(6). See Ortiz, 318 F.3d at1036-37 ("The

---

[4]In Bonner v. City of Prichard, 661 F.2d 1206, 1209-10 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted the rulings of the old Fifth Circuit (pre-October 1, 1981) as binding precedent.

identity of the actual purchaser is clearly 'a fact material to the lawfulness of the sale' of a firearm under 18 U.S.C. § 922(a)(6)." (citing Klais, 68 F.3d at 1283)).  Although the court in Ortiz declined to "address the situation where both the ultimate buyer and the 'straw purchaser' are lawfully eligible to purchase firearms," because the actual buyer in that case was ineligible, we now extend its rationale to the current instance where both the actual purchaser and the "straw man" are eligible buyers.  318 F.3d at 1038 n.16 (citing Polk, 118 F.3d 286).[5]

The Fifth Circuit in Polk agrees that the identity of the actual purchaser is material to the lawfulness of a sale when the actual purchaser is an unlawful purchaser, such as a convicted felon.  118 F3d at 295 & n.8.  However, Polk's holding also asserted that a misrepresentation of the identity of the actual purchaser is not material to the lawfulness of a sale if both parties in a "straw purchase" transaction can lawfully purchase firearms.  See id. at 295 ("Thus, if the true purchaser can lawfully purchase a firearm directly, § 922(a)(6) liability (under a "straw purchase" theory) does not attach.").

---

[5]This court has yet to address a § 922(a)(6) situation similar to Polk, with two eligible buyers effecting a straw purchase.  See United States v. Opoku, 210 F. App'x 848, 853-54 (11th Cir. 2006) (upholding the conviction of a lawful "straw purchase" defendant under 18 U.S.C. § 924(a)(1)(A), and contrasting it with § 922(a)(6), because § 924(a)(1)(A) did not require the element of materiality to the lawfulness of the sale).

To say that the identity of the actual purchaser is material to the lawfulness of one sale but not to another, is counterintuitive. Although Polk focused on whether one's identity affected the lawfulness of a sale under § 922(a)(6), 118 F.3d at 295, we focus on whether one's identity is a fact that is material to the lawfulness of a sale. See 18 U.S.C. § 922(a)(6). The identity of the purchaser is a constant that is always material to the lawfulness of the purchase of a firearm under § 922(a)(6). See Ortiz, 318 F.3d at1036-37. Thus, it can be reasoned that although the lawfulness of a sale may change depending on the identity of the purchaser, the fact that the identity of the purchaser is material to the lawfulness of the sale does not. See, e.g., United States v. Phanphil, 57 M.J. 6, 9 (C.A.A.F. 2002) (adopting the approach that under § 922(a)(6), "the identity of the true purchaser is a 'fact' material to the lawfulness of the sale, regardless of the eligibility of the true purchaser"). Therefore, under § 922(a)(6), Davis's and Lubin's false statements of the identity of the actual buyer satisfy the "fact material to the lawfulness of a sale" element, regardless of whether the actors were all lawfully eligible to purchase a firearm. Frazier's procurement of the falsification affects his liability under the aiding and abetting statute. Therefore, the district court did not err in denying Frazier's motion for judgment of acquittal as to these counts.

3.     *Frazier's Conviction for Exporting Firearms*

18

Frazier argues that the evidence presented at trial was insufficient to support his conviction under 18 U.S.C. §§ 554 and 2, fraudulently or knowingly exporting firearms. One violates § 554 if that person:

> fraudulently or knowingly exports or sends from the United States . . . any merchandise, article, or object contrary to any law or regulation of the United States, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise, article or object, prior to exportation, knowing the same to be intended for exportation contrary to any law or regulation of the United States . . . .

18 U.S.C. § 554(a).

Frazier argues that there was insufficient evidence that he participated in transporting, concealing, or helping to transport firearms from the United States to Canada. His argument is unfounded.

Frazier was responsible for ensuring Clark was paid for transporting the firearms to Canada. On at least one occasion, Clark contacted Frazier as soon as she entered Canada to inform him of her status. Frazier also explained the purpose of the trips to Clark.

Although Frazier claims that Clark's participation in the shipment of firearms was solely at the behest of Roach, the facts indicate otherwise. Clark testified that both Frazier and Roach were behind the shipment of the firearms. Clark's testimony does differ as to which defendant she had more contact with, but it does not differ in

19

the overall premise that both men were working together with her to transport the firearms to Canada. Since Frazier stipulated that he did not have a license to export firearms to Canada, the jury reasonably determined that he had violated § 554(a) beyond a reasonable doubt and the district court did not err in denying his motion for judgment of acquittal.

4.     *Roach's Conviction for Conspiracy to Commit Money Laundering*

Roach argues there was insufficient evidence to support his conviction on count 14, conspiracy to commit money laundering in violation 18 U.S.C. § 1956(a)(1)(A)(i) and (h). Roach argues that there was a lack of evidence to prove two elements in the crime, namely, that the funds he and Watts received from Nnadi on May 18, 2007, at Western Union in Miami came from unlawful activity or that he knew the funds were from unlawful activity.

To obtain a conviction on a § 1956(a)(1)(A)(i) charge, the government must prove beyond a reasonable doubt that:

> (1) the defendant conducted or attempted to conduct a financial transaction; (2) the defendant knew the property involved in the transaction represented the proceeds of unlawful activity; (3) the property involved was in fact the proceeds of the specified unlawful activity; and (4) the defendant conducted the financial transaction "with the intent to promote the carrying on of [the] specified unlawful activity."

20

United States v. Williamson, 339 F.3d 1295, 1301 (11th Cir. 2003) (quoting § 1956(a)(1)(A)(i)). Section 1956(h) subjects anyone who conspires to commit a crime under § 1956 to the same penalties as the offense conduct.

Roach concedes that his encounter with Watts satisfied elements (1) and (4) of the statute: a financial transaction that was conducted with the intent to promote unlawful activity. However, he argues that there was insufficient evidence to show that he had knowledge that the money transferred from Nnadi was the proceeds of unlawful activity, element (2), and there was insufficient evidence to show that the money transferred was, in fact, the proceeds of unlawful activity, element (3).

A § 1956(a) conviction can be sustained by circumstantial evidence. United States v. King, 169 F.3d 1035, 1038-39 (6th Cir. 1999). The government need not prove that the funds came from a specific illegal action. See United States v. Jackson, 935 F.2d 832, 839 (7th Cir. 1991). Proof that the funds were drug proceeds may be established by circumstantial evidence. United States v. Blackman, 904 F.2d 1250, 1257 (8th Cir. 1990). Circumstantial evidence may be used to prove a defendant knew the funds were drug proceeds. United States v. Gallo, 927 F.2d 815, 822 (5th Cir. 1991).

Here, the facts establish that the $900 wire transfer came from money that one of Roach's associates in Alabama owed him. Roach's associate gave the money to

21

Nnadi, a member of Roach's smuggling operation. Nnadi wired the money from Alabama, where a significant amount of Roach's smuggling activities took place. The money was then used to facilitate the illegal smuggling of firearms and drugs into Canada. Further, there was no evidence that Roach had a source of income other than his smuggling operation. From these facts, a reasonable jury would be able to infer that the $900 involved in the wire transaction was the proceeds of unlawful activity that Roach had knowledge of.

Further, Roach wired money to Watts while she was in Canada to rent the vehicles that she used to transport the firearms. Lastly, a substantial amount of evidence was presented at trial that Roach transmitted money through wire transactions to facilitate illegal activity or that was the proceeds of illegal activity. Although the facts do not establish that the $900 Nnadi wired to Watts came directly from illegal activity that Roach knew of, there was ample circumstantial evidence to allow a reasonable jury to draw such an inference. Thus, the district court did not err in denying Roach's motion for judgment of acquittal.

## III. Roach's Sentencing Offense Level

We review "objections to sentencing calculation issues raised for the first time on appeal for plain error." United States v. Bennett, 472 F.3d 825, 831 (11th Cir. 2006) (citing United States v. Harness, 180 F.3d 1232, 1234 (11th Cir.1999)). "This

standard requires that there be error, that the error be plain, and that the error affect a substantial right." Id. at 831. "A substantial right is affected if the appealing party can show that there is a reasonable probability that there would have been a different result had there been no error." Id. at 831-32. "If these three conditions are met, then we may exercise our discretion to notice the forfeited error if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id. at 832.

Here, Roach's base offense level was 24. His offense level was increased by two levels for his conviction of a money laundering offense, and his leadership role in the crimes resulted in a four-level enhancement, leaving Roach's correct offense level as 30. However, the district court miscalculated Roach's total offense level as 31.

A total offense level of 31 resulted in a recommended Guidelines range of 108 to 135 months' imprisonment. Under the correct offense level of 30, Roach's Guidelines range would have been 97 to 121 months. His sentence of 135 months was at the high end of the Guidelines range under an offense level of 31, but outside of the Guidelines range under his correct total offense level of 30. Since his sentence was outside of his correct Guidelines range, there is a reasonable probability that the district court would have sentenced Roach differently based on the correct offense level of 30. Thus, the miscalculated offense level affected Roach's substantial rights.

Since the miscalculation error seriously affected the fairness, integrity, or public reputation of the judicial proceedings in this case, see id. at 834, we hold that the district court plainly erred in sentencing Roach.

Therefore, Roach's sentence is vacated and remanded for the purpose of resentencing based on the correct total offense level and corresponding advisory Guidelines range.

## Conclusion

Both convictions were supported by sufficient evidence, so we affirm the district court's ruling in that regard. However, the district court plainly erred in using an offense level of 31 in calculating Roach's sentence. Therefore, we vacate and remand Roach's sentence for the limited purpose of resentencing him.

AFFIRMED in part, VACATED and REMANDED in part.