[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 09-16245
Non-Argument Calendar
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 18, 2010
JOHN LEY
CLERK

D. C. Docket No. 06-20170-CR-JLK

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LAURO PEREZ,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(October 18, 2010)

Before EDMONDSON, MARTIN and FAY, Circuit Judges.

PER CURIAM:

Lauro Perez appeals his convictions for trafficking in counterfeit goods and

conspiracy to traffic in counterfeit goods. He argues that the district court erred by admitting a witness's testimony comparing cigar boxes Perez manufactured with trademarked cigar boxes, when the actual cigar boxes that Perez manufactured were not admitted into evidence. Perez also argues that the evidence was insufficient to support his convictions for trafficking in counterfeit goods and conspiring to traffic in counterfeit goods. For the reasons set forth below, we affirm.

## I.

A federal grand jury charged Perez with one count of conspiracy to traffic in counterfeit goods, in violation of 18 U.S.C. § 371, and six counts of trafficking and attempting to traffic in counterfeit goods, in violation of 18 U.S.C. § 2320(a). The government alleged that Perez conspired with Hugo Endemano-Portal and with other unknown individuals to manufacture and sell cigars and cigar boxes bearing counterfeit trademarks. Perez pled not guilty to all counts and proceeded to trial. Prior to trial, the government dismissed the charges against Endemano-Portal.

At trial, Perez set forth his theory of defense during opening argument, explaining that the cigar boxes and labels he manufactured were replicas of boxes and labels sold in Cuba, rather than cigar boxes and labels that were trademarked and sold in the United States. He also explained that he generally placed on his

2

boxes a sticker indicating that the boxes were imitations.

Jose Hernandez, a detective for the Miami-Dade Police Department's Economic Crimes Bureau, testified that, on October 6, 2005, he and a confidential informant, ("the CI"), went to Perez's house to purchase packaging for unlabeled cigars they had purchased earlier that day from Endemano-Portal. Hernandez wore a recording device during his meetings with Perez. The transcript of the October 6th conversation showed that Perez informed Hernandez and the CI that "[w]e, the manufactur[ers] of the box, we make it to the best, I mean, the best way possible so it comes out good." Perez also explained that "[i]n reality . . . my wife is the one in charge of the manufacturing, but I make the contract and all that." He noted that his cousin also made boxes and worked with him. The CI placed an order for ten Montecristo Number Two cigar boxes, five Cohiba Esplendido boxes, and five Romeo y Julieta Churchill boxes.

Detective Hernandez and the CI returned to Perez's home on October 11, 2005. Hernandez paid Perez $480 for 20 cigar boxes—10 Montecristo boxes, 5 Romeo y Julieta boxes, and 5 Cohiba boxes—which corresponded with the order Hernandez and the CI had placed a week earlier. The transcript of the October 11th recorded conversation showed that Perez asked the CI to take a box to an unidentified individual. The CI asked Perez if the man was Perez's assistant, and

3

Perez responded "[y]es . . . and each person does their thing."

On November 29, 2005, Hernandez and the CI ordered 25 cigar boxes from Perez. On December 5, 2005, Hernandez and the CI met Perez at his home and paid him $2,020 for six Trinidad boxes, six Siglo VI boxes, six Esplendido boxes, six Montecristo boxes, six Romeo y Julieta boxes, six Sublime boxes, and five boxes from Perez's private line of cigar boxes. These boxes corresponded with the order Hernandez and the CI had placed on November 29th.

Hernandez admitted that the cigar boxes he purchased from Perez had been destroyed. However, he had looked carefully at the boxes and labels that he purchased from Perez and determined that the boxes he purchased in October 2005 featured Montecristo, Cohiba, and Romeo y Julieta labels, and that the boxes he purchased in December 2005 featured Cohiba Esplendido, Romeo y Julieta, Churchill, Trinidad Robusto, and Cohiba Siglo VI labels.

The government showed Hernandez a cigar box featuring the word "Montecristo." The parties subsequently stipulated that this box was an "authentic" cigar box, meaning that it featured trademarks maintained in the United States Patent and Trademark Office. Hernandez testified that the "Montecristo" word and "cross swords" design featured on the authentic box also appeared on that cigar boxes that he purchased from Perez. The government then showed

4

Hernandez a box featuring a "Trinidad" label and a "design with three interlocking T's." The parties also stipulated that this was an authentic cigar box. Hernandez stated that the label and design on the authentic box looked the same as the labels and designs that appeared on boxes that he purchased from Perez in December 2005. Perez objected to this testimony, stating that it constituted a legal conclusion, but the court overruled the objection. The government then showed Hernandez an authentic Romeo y Julieta cigar box. Hernandez testified that the Romeo y Julieta brand name appeared on the cigar boxes that he purchased from Perez. He also noted that the "balcony scene" appearing on the authentic box was featured on the boxes he purchased from Perez. The government showed Hernandez a photograph of an authentic Cohiba cigar label and cigar ring, and Hernandez stated that some of the boxes he purchased from Perez contained the Cohiba label.

On cross-examination, Hernandez acknowledged that a "Handmade in the Dominican Republic" label and a surgeon general warning appearing on the authentic Romeo y Julieta box did not appear on the boxes he had purchased from Perez. He also acknowledged that Perez's boxes contained a Cuban holographic, rather than an "Association of Dominican Cigar Manufacturers" holographic that appeared on the authentic Romeo y Julieta box. Hernandez noted that some of the

5

boxes he purchased from Perez had numbers, letters, and the words "made in Cuba" burnt into the back of them. Perez's boxes also had green labels running from the upper side of the boxes to the back of the boxes, and some boxes had a label in an upper corner stating "Habanos." Hernandez acknowledged that these labels were not on the authentic cigar boxes.

Hernandez testified that, to his knowledge, the CI had not spoken to Perez outside of Hernandez's presence. Hernandez never saw a "cigar box imitations" label on any of the boxes Perez made. He also never heard the CI tell Perez not to put such a label on the boxes.

After Hernandez's testimony, the government admitted into evidence GE 16, identified as a cigar box and cigar labels recovered from Perez's home during a December 15, 2005 search, and GE 17, identified as a series of photographs depicting property that was recovered from the search of Perez's home on December 15th.

The government then rested and Perez moved for a judgment of acquittal, arguing that Hernandez, the only witness who had any direct knowledge about the boxes that Perez sold to him, failed to testify that the labels on Perez's boxes were exactly the same as the trademarked labels.

The government responded that Detective Hernandez had testified that the

6

words and images appearing on the labels of the authentic cigar boxes also appeared on the boxes that he purchased from Perez. It also asserted that, because the search of Hernandez's home occurred only nine days after the December 2005 transaction, the jury could make a "common sense determination that [the seized] boxes would have looked like what the detective bought." Finally, it pointed out that, during recorded conversations, Perez stated that he could get "the best boxes" and "make them in any brand [Hernandez] want[ed]."

The court denied Perez's motion for a judgment of acquittal, finding that, although the boxes that Hernandez purchased from Perez had been destroyed, "there [was] sufficient evidence to make it a jury issue."

Perez took the stand on his own behalf and testified that he affixed labels to his cigar boxes, indicating that the boxes were imitations. He did not place the "imitation" stickers on the boxes he sold to Hernandez and the CI, because the CI told him that he would place the stickers on the boxes later. Perez explained that Hernandez was not present when the CI told him not to place the stickers on the boxes. Perez also testified that the boxes he manufactured were not similar in size or shape to the authentic cigar boxes. He noted that his boxes had writing burned into the back of them that stated in Spanish that they were made in Cuba. The boxes also had a green label that ran from the top to the bottom of the box and did

7

not state that they were handmade in the Dominican Republic.

On cross-examination, Perez acknowledged that he never mentioned the imitation stickers in Hernandez's presence. Perez agreed that the cross-sword design and lettering on one of the cigar boxes that detectives found in his home looked similar to the design and lettering on the authentic Montecristo box. He also acknowledged that the Montecristo box seized from his home was similar to, if not exactly the same as, the Montecristo boxes he sold to Hernandez. Specifically, he noted that the crossed-sword design and "Montecristo" lettering on the boxes found in his home were also featured on the boxes that he sold to Hernandez. Perez acknowledged that the balcony scenes on some of his boxes were similar to the balcony scenes on the authentic Romeo y Julieta box. He stated that the Romeo y Julieta boxes that were seized from his home were exactly the same as the boxes he sold to Hernandez, and that the logo on the Cohiba boxes seized from his home were the same as the logos on the Cohiba boxes that he sold to Hernandez. Perez knew that the Romeo y Julieta logo was trademarked, although he thought it was "registered by the Dominican Republic." He also knew that the Cohiba, Trinidad, and Montecristo brands and logos were trademarked in the United States.

On redirect, Perez testified that the balcony scene featured on his boxes used

8

different shades of ink than the balcony scene on the Romeo y Julieta cigar boxes that were sold in the United States. He stated that his intention was "to reproduce the genuine Cuban boxes which are not sold in the United States."

After Perez's testimony, the defense rested. Perez then renewed his motion for a directed verdict, which the court denied. The jury found Perez guilty of all seven counts, and the court sentenced Perez to two years' probation.

## II.

### A. *Admission of Hernandez's Testimony*

We review for abuse of discretion the district court's decision to admit or exclude evidence. *See United States v. Smith*, 122 F.3d 1355, 1357 (11th Cir. 1997). We review *de novo* questions of constitutional law. *United States v. Paige*, 604 F.3d 1268, 1274 (11th Cir. 2010), *petition for cert. filed,* (U.S. Jul. 26, 2010) (No. 10-5658). If a defendant fails to raise an argument before the district court, we review only for plain error. *United States v. Bacon*, 598 F.3d 772, 777 (11th Cir. 2010).

The Fifth and Sixth Amendments require that "criminal convictions . . . rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." *United States v. Gaudin*, 515 U.S. 506, 510, 115 S.Ct. 2310, 2313, 132 L.Ed.2d 444 (1995). The Federal

Rules of Evidence provide that

> [i]f the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge. . . .

Fed.R.Evid. 701. With respect to non-expert witnesses, "testimony in the form of an opinion or inference otherwise admissible *is not* objectionable because it embraces an ultimate issue to be decided by the trier of fact." Fed.R.Evid. 704(a) (emphasis added); *see Carter v. DecisionOne Corp. Through C.T. Corp. Sys.*, 122 F.3d 997, 1005 (11th Cir. 1997) ("Fed.R.Evid. 704(a) has abolished the prohibition on opinion testimony concerning the 'ultimate issue' in a case. Such opinions are properly admitted if they are based on the personal observations of the witness.").

Section 2320 of Title 18 of the United States Code provides criminal penalties for individuals who "intentionally traffic[] or attempt[] to traffic in goods or services and knowingly use[] a counterfeit mark on or in connection with such goods or services." 18 U.S.C. § 2320(a)(1). Section 2320 "does not specify the means by which the Government may establish that the marks were 'identical or substantially indistinguishable.'" *United States v. Guerra*, 293 F.3d 1279, 1288 (11th Cir. 2002). "There is no support for the proposition that in all cases, the trier of fact must determine indistinguishability based on the marks as affixed to the

10

actual goods." *Id.*

As an initial matter, although the government argues that we should review Perez's claim for plain error, Perez did, in fact, object to Hernandez's testimony at trial on the basis that his testimony constituted a legal conclusion. Thus, because Perez raised the issue before the trial court, the plain error standard does not apply. *See Bacon*, 598 F.3d at 777.

The district court did not abuse its discretion in overruling Perez's objection to Hernandez's testimony, because the testimony was admissible under Fed.R.Evid. 701. *See* Fed.R.Evid. 701. First, Hernandez testified as a lay witness rather than an expert witness. Second, Hernandez's testimony was rationally based on his perception. *See id.* Hernandez stated that he had looked carefully at the boxes and labels that he purchased from Perez in October and December 2005. Based on these observations, he testified that the labels on Perez's cigar boxes looked the same as the labels found on authentic cigar boxes. Furthermore, Hernandez's testimony was helpful to the determination of a fact in issue, as it helped the jury determine whether the marks on the boxes Perez sold to him were the same or substantially similar to the trademarked logos on the authentic cigar boxes. *See id.* Finally, Hernandez's testimony was admissible under the Federal Rules of Evidence, even though it addressed an ultimate issue to be decided by the

11

jury, because the Rules provide that a lay witness's testimony is not objectionable simply because it embraces an ultimate issue to be decided by the trier of fact. *See* Fed.R.Evid. 704(a).

The admission of Hernandez's testimony also did not violate the Fifth and Sixth Amendments, because the jury was free to disbelieve Hernandez's testimony and draw its own conclusions regarding the nature of the marks on the boxes that Perez sold to Hernandez. *See United States v. Calderon*, 127 F.3d 1314, 1325 (11th Cir. 1997) ("[C]redibility determinations are the exclusive province of the jury."). In fact, the jury heard testimony from both Hernandez and Perez indicating that there were differences between the boxes that Perez made and the authentic cigar boxes. Accordingly, because neither 18 U.S.C. § 2320(a) nor the Federal Rules of Evidence barred Hernandez's testimony, and because the jury was free to accept or reject Hernandez's testimony, the district court did not err in admitting Hernandez's testimony. *See Guerra*, 293 F.3d at 1288; Fed.R.Evid. 701, 704.

> *B.*      *Sufficiency of the Evidence – Trafficking in Counterfeit Goods*

We review *de novo* the sufficiency of the evidence presented at trial to support a criminal conviction. *United States v. Frazier*, 605 F.3d 1271, 1278 (11th Cir. 2010). "In evaluating the sufficiency of the evidence, we view the evidence in the light most favorable to the government, with all reasonable inferences and

credibility choices made in the government's favor."  *Id.* (quotation omitted).

As noted above, 18 U.S.C. § 2320(a) provides criminal penalties for individuals who "intentionally traffic[] or attempt[] to traffic in goods or services and knowingly use[] a counterfeit mark on or in connection with such goods or services."  18 U.S.C. § 2320(a).  A "counterfeit mark" is defined, *inter alia*, as

> a spurious mark . . . that is used in connection with trafficking in . . . goods . . . ; that is identical with, or substantially indistinguishable from, a mark registered on the principal register in the United States Patent and Trademark Office and in use, whether or not the defendant knew such mark was so registered; . . . that is applied to or used in connections with the goods . . . for which the mark is registered with the United States Patent and Trademark Office . . . ; and . . . the use of which is likely to cause confusion, to cause mistake, or to deceive.

18 U.S.C. § 2320(e)(1)(A).

Perez first argues that the government failed to show that he knowingly and willfully used a counterfeit mark, because he attached labels to his boxes stating that the boxes were reproductions.  However, although Perez testified at trial that he usually placed "imitation" stickers on the boxes he manufactured, he acknowledged that he did not place the stickers on the boxes he sold to Hernandez and the CI.  Perez's testimony, that the CI told him that he would place the imitation stickers on the boxes at a later time, was uncorroborated, and Hernandez never heard the CI tell Perez not to place the imitation stickers on the boxes.  Furthermore, Hernandez did not believe that the CI ever spoke to Perez when

13

Hernandez was not present. Based on this evidence, it would have been reasonable for the jury to determine that Perez's testimony regarding his conversation with the CI was incredible. *See Frazier*, 605 F.3d at 1278 (noting that we must "view the evidence in the light most favorable to the government" and draw "all reasonable . . . credibility choices . . . in the government's favor").

Next, Perez argues that the evidence was insufficient to sustain his convictions for trafficking in counterfeit goods, because the boxes he manufactured and sold featured marks corresponding to cigar boxes produced in Cuba, rather than boxes produced in the United States or Dominican Republic. However, Perez stipulated at trial that the marks found on the "authentic" cigar boxes were trademarked in the United States. Furthermore, Perez testified at trial that he knew that the Cohiba, Trinidad, and Montecristo brands and logos were trademarked in the United States. In fact, even if Perez had not known that the logos were trademarked in the United States, his convictions would still stand. *See Guerra*, 293 F.3d at 1287 (holding that "it is irrelevant that [the defendant] did not know the marks were registered in the United States, or thought the marks were only unprotectable Cuban marks"); 18 U.S.C. § 2320(e)(1)(A) (defining a counterfeit mark as a mark that is identical with, or substantially indistinguishable from, a mark registered on the principal register in the United States Patent and Trademark

14

Office and in use, *whether or not the defendant knew such mark was so registered*) (emphasis added). Accordingly, we affirm Perez's convictions for trafficking in counterfeit goods.

### C. *Sufficiency of the Evidence – Conspiracy to Traffic in Counterfeit Goods*

We review *de novo* the sufficiency of the evidence presented at trial to support a criminal conviction. *Frazier*, 605 F.3d at 1278. "In evaluating the sufficiency of the evidence, we view the evidence in the light most favorable to the government, with all reasonable inferences and credibility choices made in the government's favor." *Id.* (quotation omitted).

"The essential elements of the offense of conspiracy under 18 U.S.C. § 371 are an agreement between two or more persons to commit a crime against the United States and an overt act by one of them in furtherance of the agreement." *Guerra*, 293 F.3d at 1285. "The existence of a conspiracy may be proved by circumstantial evidence and may be inferred from concert of action." *Id.* "[A]n individual can be convicted of conspiracy with 'unknown persons' referred to in the indictment," even if those individuals are not brought to trial. *United States v. Figueroa*, 720 F.2d 1239, 1245 n.8 (11th Cir. 1983).

The evidence presented at trial was sufficient to support Perez's conviction for conspiracy to traffic in counterfeit goods. First, the evidence was sufficient to

establish that Perez entered into an agreement with another individual to traffic in counterfeit goods. As an initial matter, although the indictment named Endemano-Portal as a co-conspirator, the indictment also alleged that Perez conspired with other unknown individuals to manufacture and sell counterfeit cigars and cigar boxes. Thus, the government did not have to prove that Perez conspired with Endemano-Portal. It simply had to prove that Perez conspired with at least one other individual. *See id.*

At trial, the government introduced transcripts of recorded conversations. In these recorded conversations, Perez explained that his "wife is the one in charge of the manufacturing," while he "make[s] the contract and all that." Perez also mentioned that his cousin worked with him making boxes. In a second recorded conversation, Perez indicated that an unidentified man was his assistant, and he noted that "each person does their thing." Perez also used the word "we" when referring to his cigar box manufacturing business. This evidence, viewed in the light most favorable to the government, was sufficient for the jury to conclude that Perez conspired with his wife, his cousin, and/or the individual that Perez identified as his "assistant" to sell counterfeit cigar boxes. *See Frazier*, 605 F.3d at 1278; *Guerra*, 293 F.3d at 1285 (providing that a conspiracy may be proven by circumstantial evidence and inferred from a concert of action).

16

The evidence also showed that Perez committed an "overt act . . . in furtherance of the agreement" to traffic in counterfeit goods. *See Guerra*, 293 F.3d at 1285. Specifically, the evidence, viewed in the light most favorable to the government, established that Perez sold to Hernandez and the CI cigar boxes that contained counterfeit marks. Hernandez's testimony, as well as a recorded conversation, showed that Hernandez and the CI ordered the boxes they purchased from Perez by specifying which trademarks they wanted on the boxes. Hernandez testified that the logos that appeared on the boxes were the same as the logos that appeared on authentic cigar boxes. Furthermore, Perez testified that the boxes that he sold to Hernandez and the CI were similar, if not exactly the same, as boxes that were seized from his home on December 15, 2005. Photographs of boxes that were seized from Perez's home were admitted into evidence so that the jury could compare the marks on these boxes to the marks on the authentic cigar boxes. Finally, the parties stipulated that the marks on the authentic cigar boxes were trademarked in the United States. Based on this evidence, the jury could have reasonably concluded that Perez sold to Hernandez and the CI cigar boxes that featured counterfeit marks. Thus, the evidence was sufficient to establish that Perez took an overt act in furtherance of the conspiracy. *See id.* Accordingly, based upon our review of the record and consideration of the parties' briefs, we

affirm Perez's conviction for conspiring to traffic in counterfeit goods.

**AFFIRMED.**