[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-13230

_____

D.C. No. 4:14-cr-00022-HLM-WEJ-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

BRYANT L. COCHRAN,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(March 17, 2017)

Before ED CARNES, Chief Judge, ANDERSON, Circuit Judge, and
ROSENBERG,[*] District Judge.

PER CURIAM:

_____

[*]     Honorable Robin L. Rosenberg, United States District Judge for the Southern District of
Florida, sitting by designation.

Appellant Bryant Cochran is the former chief magistrate judge of Murray County, Georgia. In 2014 he was charged with and subsequently convicted of: 1) conspiring against the right of A.G., a Murray County resident, to be free from unreasonable search and seizure by those acting under color of law, in violation of 18 U.S.C. § 241 ("Count One"); (2) depriving V.R., the Murray County Clerk of Court, of the right to be free from willful sexual assault while acting under the color of law, in violation of 18 U.S.C. § 242 ("Count Two"); (3) depriving S.P., the court secretary, of the right to be free from an unreasonable search and seizure of her cellphone while acting under the color of law, in violation of 18 U.S.C. § 242 ("Count Three"); (4) depriving A.G. of the right to be free from unreasonable search and seizure by causing her to be arrested for possession of methamphetamine while acting under the color of law, in violation of 18 U.S.C. § 242 ("Count Four"); (5) conspiring to distribute the controlled substance methamphetamine, in violation of 21 U.S.C. § 846 ("Count Five"); and (6) tampering with a witness, in violation of 18 U.S.C. § 1512 ("Count Six"). He was sentenced to concurrent terms and is presently serving a sixty-month prison sentence. We have had the benefit of the parties' carefully crafted briefs, a searching review of the trial record, and vigorous oral argument. For the reasons set forth below, we conclude that Cochran's convictions are due to be affirmed in part and vacated in part.

## I. Background

Although Cochran was tried on all six charges at the same time—the propriety of which is challenged here and discussed below—because the charged offenses stem from separate interactions with three individuals (A.G., V.R., and S.P.) we present the factual background for each separately.

### A. Counts One, Four, Five, & Six: Cochran's Interactions with A.G.

Counts One, Four, Five, and Six stem from allegations that Cochran sexually propositioned A.G. and, after being publicly exposed by her husband during a contested reelection campaign, sought to discredit her by planting methamphetamine on her car and having her arrested.

On April 9, 2012, A.G. went to the Murray County Magistrate's Office to apply for arrest warrants for three individuals who she claimed had attacked her the previous day. A.G. had not met Cochran previously—although she was aware that he and her husband were friends—and Cochran invited her into his office alone. During this meeting, and over the course of the following days, Cochran made a series of sexually suggestive and inappropriate comments towards A.G.

Subsequent to these interactions, A.G.'s husband told her that Cochran had said that she made sexual advances toward Cochran. A.G. explained that Cochran was lying and that it was in fact he who had sexually propositioned her. This caused A.G.'s husband to go to the local media. By mid-July it was widely known

in Murray County that A.G. alleged that Cochran sexually propositioned her when she went to see him about a matter in his capacity as a magistrate. This was especially disadvantageous to Cochran because he was in the middle of a campaign for reelection to his position as a magistrate judge.

After A.G.'s allegations became known in the community, Cochran attempted to provide information to at least eight different law enforcement officers regarding A.G.'s use of methamphetamine.[1] Testimony from these officers showed that Cochran described A.G.'s vehicle, informed them that she would likely be carrying methamphetamine, and stated that if they could arrest her it would really "help him out." The officers did not act on the tip.

During this time, Clifford Joyce was a tenant in a trailer park owned by Cochran. Joyce routinely used methamphetamine with A.G.[2] Between August 2011 and August 2012 there were 339 telephone calls and 125 text messages between Cochran and Joyce. On several occasions, Joyce referred to Cochran as his boss and demonstrated a subservient role vis-à-vis Cochran, who appeared to be his employer. On August 12, 2012, at around 1:30 a.m., Joyce made an

---

[1]    A.G. admitted that during the summer of 2012 she used methamphetamine several times a week.

[2]    Joyce pleaded guilty to conspiring to distribute the methamphetamine that was found under A.G.'s car. He was sentenced to eighteen months of incarceration. United States v. Joyce, 4:13-CR-034-HLM (N.D. Ga. Dec. 13, 2013). He did not testify at Cochran's trial.

unannounced visit to A.G.'s trailer during which he acted "very nervously." He asked to use the bathroom and, after coming out, asked A.G. if she had a backdoor to her trailer. A.G. informed him that she did not, but that she had a side door and a back window. Joyce stated that he did not want anyone to see him leave and asked if he could leave by going out her back window. On that night A.G.'s car was parked near the window that Joyce went out when he left the trailer.

During the day and early evening of August 14, 2012, A.G. smoked methamphetamine. That evening as she was being driven home in her car, Deputy Sheriff Joshua Greeson[3] pulled over her car. Greeson asked A.G. if she would consent to a search of her car, which she did. Deputy Sheriff Joe Wilkey heard over the radio that Greeson had stopped A.G.'s car and, being familiar with the allegations against Cochran, went to offer assistance. When Wilkey arrived, Captain Michael Henderson,[4] the shift commander and Cochran's cousin, was already there but the search had not commenced. Greeson and Wilkey began searching the car but initially did not find any contraband. While the search was in progress, Henderson twice called Cochran's cellphone but received no answer.

---

[3]    Greeson pleaded guilty to witness tampering and was sentenced to ten months of incarceration. United States v. Greeson, 4:13-CR-002-HLM (N.D. Ga. Sept. 25, 2013). Greeson did not testify at trial.

[4]    Henderson pleaded guilty to witness tampering and was sentenced to 12 months and one-day of incarceration. United States v. Henderson, 4:13-CR-015-HLM (N.D. Ga. Oct. 30, 2013). Henderson did not testify at trial.

One minute later Cochran returned Henderson's calls and they talked for one minute and forty-seven seconds.

Henderson then radioed Wilkey and told him to come to Henderson's patrol car. Henderson explained that the information he received was that contraband would be located on the left side of the car in a metal box. Wilkey relayed Henderson's information to Greeson, who went to the left side of the car and found methamphetamine in a metal box attached to the outside of the car under the driver's side. Wilkey radioed Henderson that they found the methamphetamine under the car as described and immediately thereafter Henderson called Cochran and they spoke for about one minute. A.G. was placed under arrest and charged with possession of methamphetamine.

The next day, Georgia Bureau of Investigation ("GBI") agents began investigating the circumstances surrounding A.G.'s arrest. On August 22, they interviewed Joyce for one hour and forty minutes. After that interview, they advised the Murray County District Attorney what Joyce told them. Upon hearing the details of Joyce's interview, the district attorney promptly dismissed the charge against A.G.

Also on August 22, GBI and FBI agents conducted interviews regarding A.G.'s arrest at the Murray County Sheriff's Office. At 11:25 a.m. that day, Cochran called Henderson and they talked for six minutes and forty-seven seconds.

Later, at 5:01 p.m., they talked again for about twelve minutes. Then, at about 6:00 or 7:00 p.m., GBI arranged to have Henderson come to the Sheriff's Office for an interview that evening. Thereafter, at 7:26 p.m., Cochran and Henderson talked for ten minutes and nineteen seconds. Henderson's interview began shortly after 7:30 p.m. During the interview, Henderson stated that Cochran was the source of the information about where the methamphetamine would be found. Henderson stated that he did not know where Cochran had gotten his information. However, the next day, Henderson was interviewed again. He admitted that he had spoken to Cochran since the first interview and that Cochran told him that his source of information was Mike Winkler.

Winkler testified that he was acquainted with A.G. and was aware that she was using drugs, but said that he had no knowledge about where she hid drugs in or on her car. Winkler also knew Cochran. After Winkler learned that A.G. had been arrested, he met with Cochran. During the meeting, according to Winkler's testimony, Cochran asked Winkler to tell the GBI agents that Winkler had previously told Cochran where drugs would be found on A.G.'s car and that they would be in a metal or magnetic key box. Cochran also stated that if Winkler did so, it would help Cochran and possibly "keep him out of jail."

7

### B. Count Two: Cochran's Interactions with V.R.

In Count Two, Cochran was charged with, and subsequently convicted of, violating the constitutional rights of V.R. by sexually assaulting her. Cochran's conviction was based on testimony—primarily by V.R. and S.P.—that he: (a) pushed his hand inside V.R.'s pants and under her underwear; (b) put his hand under V.R.'s shirt and bra; (c) propositioned V.R. to have sex in the office bathroom; (d) rubbed his body against V.R. and rubbed his hand over V.R.'s body; and (e) felt V.R.'s leg under her skirt.

### C. Count Three: Cochran's Interactions with S.P.

In Count Three, Cochran was charged with, and subsequently convicted of, violating the constitutional rights of S.P. by searching her cellphone without permission on at least two occasions. The primary testimony on this issue came from two people: S.P. and court deputy marshal Kelly Thurman. S.P. testified that during her time at the court, she owned a personal cellphone—which she occasionally used for court business—that she and her husband purchased and for which they paid the monthly bill. She testified that she caught Cochran at her desk "looking through" her cell phone and, when she confronted him, he replied that because it "was on county property," he had the right to "access" the phone. Thurman testified that he witnessed Cochran pick up S.P.'s cellphone and sit down at her desk "thumbing through it." According to Thurman, S.P. confronted

8

Cochran about what he was doing and Cochran responded that he was "just looking" before S.P. demanded that he return the phone.

### D. Procedural History

On August 12, 2014, a grand jury in the Northern District of Georgia returned a six-count indictment against Cochran. Cochran moved to sever Counts Two and Three from the indictment, but a magistrate court denied that motion. On December 2, 2014, Cochran proceeded to trial, and the jury convicted him on all counts. On July 8, 2015, the district court sentenced Cochran to sixty months of imprisonment followed by three years of supervised release. Cochran timely appealed.

## II. Discussion

On appeal, Cochran argues that: (1) the district court committed reversible error by excluding, on hearsay grounds, witness testimony regarding a potential confidential tip; (2) there was insufficient evidence for a rational juror to find him guilty of Count One—conspiracy to plant methamphetamine on A.G.'s car and have her falsely arrested—and Count Five—conspiracy to distribute that same methamphetamine; (3) the district court committed reversible error by excluding evidence regarding his relationship with the alleged sexual assault victim, V.R.; (4) he did not have fair warning at the time of the offense that searching an employee's cellphone without permission was a constitutional violation; and (5) the district

court erred in denying his motion to sever Counts Two and Three. We discuss each in turn.

## A. The "Hearsay" Testimony

At trial, Cochran attempted to show that he knew that A.G. carried methamphetamine in a metal container attached to the bottom of her car because Winkler told him so. Cochran argues that if he received such a tip—rather than making it up and then asking Winkler to lie as the government was trying to prove—there was insufficient evidence to convict him of the conspiracy or witness tampering charges. However, Winkler testified and denied knowing how A.G. carried methamphetamine in her car. Therefore, Cochran's trial counsel attempted to question Cochran's niece, Erica Sanford, about conversations that would allegedly show Winkler did know where A.G. carried her drugs. The Government timely objected on hearsay grounds and the trial court sustained many of the Government's objections. On appeal, Cochran argues that Sanford's testimony was admissible on two grounds. First, he argues that it was not offered for the truth of the matter asserted—namely where A.G. transported drugs—but rather to prove that Winkler was the source of Cochran's knowledge about where methamphetamine could be found on A.G.'s car. Second, he argues that it was necessary to impeach Winkler's testimony that he did not know how A.G. transported her drugs.

10

Generally, "[t]his Court reviews a district court's evidentiary rulings for a clear abuse of discretion [and] will reverse . . . only if the resulting error affected the defendant's substantial rights." United States v. Dodds, 347 F.3d 893, 897 (11th Cir. 2003). However, where an evidentiary objection is not adequately preserved, we review for plain error. United States v. Stephens, 365 F.3d 967, 974 (11th Cir. 2004). In order to preserve an objection for appellate review, "the substance of the evidence must be made known to the court by offer or be apparent from the context within which questions were asked." Id.; see also United States v. Quinn, 123 F.3d 1415, 1420 (11th Cir. 1997) ("Where the substance of the evidence is apparent to the court from its context, an appellant is entitled to ordinary appellate review of a ruling excluding evidence.").

Under either standard, the appellant must show that the error affected a substantial right, "which in the ordinary case means he must demonstrate that it affected the outcome of the district court proceedings." Puckett v. United States, 556 U.S. 129, 135, 129 S. Ct. 1423, 1429 (2009) (internal quotation omitted). If the error "had no substantial influence on the outcome and sufficient evidence uninfected by error supports the verdict," it is harmless and reversal is not necessary. United States v. Hands, 184 F.3d 1322, 1329 (11th Cir. 1999). Accordingly, if we "can say with fair assurance that the judgment was not substantially swayed by the error, judgment is due to be affirmed even though

11

there was error." United States v. Jones, 601 F.3d 1247, 1264 (11th Cir. 2010) (quoting United States v. Hornaday, 392 F.3d 1306, 1315–16 (11th Cir. 2004)).

An out-of-court statement is not hearsay, and may be admitted into evidence, if it is offered for some purpose other than to prove the truth of the matter asserted. Fed. R. Evid. 801(c)(2); see also, e.g., United States v. Parry, 649 F.2d 292, 295 (5th Cir. 1981) ("Using an out-of-court utterance as circumstantial evidence of the declarant's knowledge of the existence of some fact, rather than as testimonial evidence of the truth of the matter asserted, does not offend the hearsay rule.").[5] Likewise, evidence of a prior inconsistent statement by a witness may be admitted to impeach that witness. See, e.g., United States v. Sisto, 534 F.2d 616, 622 (5th Cir. 1976).

As an initial matter, we think that the evidentiary objection was adequately raised to preserve the issue for appellate review under the abuse-of-discretion standard. The response of Cochran's trial counsel to the Government's hearsay objections,[6] while far from a model of clarity, should have adequately informed the district court of the grounds on which the testimony was arguably admissible.

---

[5] In Bonner v. City of Prichard, the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions delivered on or before September 30, 1981. 661 F.2d 1206, 1209 (11th Cir. 1981).

[6] In response to the Government's hearsay objection, Cochran's trial counsel argued that "Mr. Winkler's testified and he's been clear that he didn't have these conversations with her." He also informed the court, "Judge, it's not so much the truth of what he said, but the fact that he was providing the tip to Ms. Sanford and Mr. Cochran . . . ."

Moreover, while it would have been advisable to make a proffer of the excluded testimony at trial, the context provided by Winkler's testimony and the preceding questions to Sanford made a proffer unnecessary to preserve the question for our review.

We also think that the district court did in fact abuse its discretion by excluding Sanford's testimony. The evidence, viewed properly, was not being offered for the truth of the matter asserted—that A.G. actually stored her drugs in the indicated location—but rather to show that Winkler did in fact tell Sanford that he had a tip for Cochran. From that the jury could infer that Winkler was the source of Cochran's tip to law enforcement, i.e., that Cochran had a legitimate basis for that information. Additionally, having previously laid a foundation on which Sanford's testimony could have been based, Cochran was entitled to impeach Winkler's testimony that he had not provided the tip, but rather that Cochran had urged him to falsely testify that he was Cochran's source.

However, because we cannot conclude that the error affected Cochran's substantial rights, any effect it may have had on the trial was, ultimately, harmless. The combination of the Government's overwhelming evidence against Cochran and the fact that Cochran was allowed to present most of the evidence defense counsel sought to introduce gives us "fair assurance that the judgment was not substantially swayed by the error." Jones, 601 F.3d at 1264.

13

With regard to Counts One, Four, and Five—i.e., all but Count Six[7]—this is not even a close call. The Government's evidence showed that Cochran had motive to frame A.G.; that Cochran had opportunity to plant the methamphetamine through Joyce; that Joyce displayed subservient tendencies towards Cochran; that Joyce acted suspiciously in A.G.'s trailer on the night of August 11, 2012, when he had an opportunity to plant the methamphetamine in the metal box under the driver's side of A.G.'s car; that Cochran had opportunity to have her arrested through Henderson and Greeson and did, in fact, tell the arresting officer precisely where the drugs would be found; that Cochran spoke to Henderson immediately before and after A.G.'s arrest; that A.G. consented to the search of her vehicle and expressed shock (recorded on video) at the discovery of drugs thereon; that Cochran and Henderson conspired to hide their role in A.G.'s arrest; and that the district attorney dropped all charges against A.G. after learning of the contents of Joyce's interview with the GBI. This constitutes overwhelming evidence that the drugs found under A.G.'s vehicle did not belong to her but were planted by Joyce as part of a conspiracy engineered by Cochran. Sanford's proposed testimony would not have undermined any of that evidence.

---

[7]    The challenged hearsay evidence is obviously not relevant to Counts Two and Three.

14

As to Count Six, while we recognize that the potential effect of Sanford's testimony on the trial's outcome is a closer call, we are persuaded that Cochran was able to get the full substance of Sanford's testimony before the jury and that, accordingly, any error was harmless. There is no dispute—and Cochran admits as much on appeal—that Winkler and Cochran talked repeatedly about A.G.'s drug use in the month leading up to her arrest. Also, and very significantly, counsel was able to get Sanford to testify to almost everything he desired. Sanford was permitted to tell the jury that Winkler told her that he had a specific tip for Cochran about A.G.'s drug use. And then counsel asked if any of her communications with Winkler related to specific details about where A.G. carried her drugs. Sanford replied, "yes," at which point the Government objected and the objection was sustained.[8] Thus, Sanford was permitted to testify without objection to almost everything counsel was trying to get Sanford to say. Accordingly, Cochran is complaining on appeal only about the inability to have Sanford explicitly testify (i.e., without objection) that the Winkler tip gave Cochran specific information about the magnetic container located under A.G.'s vehicle. We are persuaded that the district court's error was harmless.

---

[8]    Cochran's counsel put the following question to Sanford: "Did any of those communications [with Winkler] relate—this is a 'yes' or 'no' question—to specific details about where she carried drugs?" Sanford replied, "Yes," at which point the Government objected on hearsay and leading grounds and the court sustained the objection.

Moreover, there was testimony at trial that another person told Cochran that A.G. carried her drugs in a magnetic container under the car. Cochran's lifelong friend, Kevin Jones, testified that he had informed Cochran of how and where A.G. carried her drugs.[9] Thus, the jury was presented with evidence indicating that Cochran was aware of A.G.'s method of transporting drugs, but the jury nonetheless believed Cochran was guilty.

Neither are we convinced that the evidence, admitted for impeachment, would have had any impact on the outcome of the trial. As we have recognized in a related context, an "error is harmless if the witness' credibility was sufficiently impeached by other evidence." United States v. Burston, 159 F.3d 1328, 1336 (11th Cir. 1998) (considering Rule 609 evidence). Cochran's trial counsel ably cross examined Winkler and the great bulk of Sanford's direct examination was focused on refuting that testimony. Even if Sanford had been allowed to testify that Winkler told her where A.G. carried her drugs, the sheer volume of impeachment evidence offered against Winkler makes it unlikely that one additional piece would have tipped the balance of his credibility with the jury. We do not believe that the

---

[9] Jones testified under direct examination from Cochran's counsel that he had told Cochran, prior to A.G.'s arrest, that "she was running drugs and she would normally keep it under her car in some sort of metal container." On cross-examination by the Government, Jones reiterated that he "had heard that she was running drugs and it was—and she would normally run it with a—in her car in a metal container." He further testified on cross examination that the container was "normally on the [d]river's side of the car" and that he passed this information along to Cochran.

jury's decision to credit Winkler's testimony over that of Sanford—who faced her fair share of impeachment—would have been swayed by Sanford's additional offering.

In short, we cannot conclude that the decision to exclude Sanford's testimony—either for a purpose other than the truth of the matter asserted or for the purposes of impeachment—prejudiced Cochran's substantial rights. Accordingly, even though the district court abused its discretion and the error was properly preserved, we decline to vacate any of Cochran's convictions on this basis.

## B. Sufficiency of the Evidence

Cochran next argues that the government failed to show a conspiracy as to Count One—conspiring against the right of A.G. to be free from unreasonable search and seizure—and Count Five—conspiring to distribute methamphetamine. We review de novo whether there is sufficient evidence in the record to support a jury's verdict in a criminal trial, viewing the "evidence in the light most favorable to the government, with all reasonable inferences and credibility choices made in the government's favor." United States v. Frazier, 605 F.3d 1271, 1278 (11th Cir. 2010). Under that standard, we have no trouble concluding that Cochran's argument on this issue is meritless. We have already indicated that the evidence on these counts was overwhelming, supra II.A; it follows that it was certainly more

17

than sufficient to allow a reasonable factfinder to find guilt beyond a reasonable doubt.

## C. Rule 412 Evidence

Cochran next argues that the district court erred by excluding evidence of his relationship with V.R. as it pertains to Count Two.[10] In a criminal proceeding involving alleged sexual misconduct, evidence offered to prove that a victim engaged in other sexual behavior to prove a victim's sexual predisposition is inadmissible. Fed. R. Evid. 412(a). However, a district court may admit evidence of specific instances of sexual behavior if offered to prove consent or if exclusion would violate the defendant's constitutional rights. Fed. R. Evid. 412(b)(1)(B) and (C). We review a district court's application of Rule 412 for abuse of discretion and review <u>de novo</u> whether the exclusion of evidence violated a constitutional guarantee. <u>United States v. Culver</u>, 598 F.3d 740, 749 (11th Cir. 2010) (as to Rule 412); <u>United States v. Sarras</u>, 575 F.3d 1191, 1209 n.24 (11th Cir. 2009) (as to constitutional guarantee).

With respect to the lone piece of evidence that complied with Rule 412's procedural requirements, the district court properly excluded testimony on the

---

[10]    We consider only the admissibility of testimony that V.R. allegedly rubbed her buttocks against Cochran. A party intending to offer evidence under Rule 412 must "file a motion that specifically describes the evidence and states the purpose for which it is to be offered" at least fourteen days before trial. Fed. R. Evid. 412(c). Cochran's failure to comply with these procedural requirements is, standing alone, sufficient reason to affirm the district court's decision with respect to the other pieces of evidence he sought to have admitted.

subject given that Cochran never conceded that any of the events in question happened and, accordingly, never so much as hinted that they were consensual in nature.[11] As we have previously noted, "[l]imitations on a defendant's constitutional right to present evidence are permissible unless they are 'arbitrary or disproportionate to the purposes they are designed to serve.' " Culver, 598 F.3d at 749 (quoting Michigan v. Lucas, 500 U.S. 145, 151, 111 S. Ct. 1743, 1747 (1991)). In this case, the district court's denial of Cochran's request to elicit testimony pertaining to a defense he clearly never sought to present was certainly not arbitrary or disproportionate.

## D. Fair Warning of a Constitutional Violation

Cochran next argues that he did not have the required "fair warning" that searching an employee's cellphone violated the Fourth Amendment and, therefore, that his conviction on Count Three must be overturned. The language of 18 U.S.C. § 242—under which Cochran was convicted—refers to deprivation of rights protected by the Constitution or the laws of the United States.[12] Accordingly,

---

[11]   We do not hold, nor did the district court, that Cochran needed to present independent evidence of consent or that he was required to testify on his own behalf in order to establish this defense. Rather we, like the district court, merely conclude that where Cochran made no discernible attempt to establish, or even argue, a consent defense, the testimony in question was properly excluded.

[12]   The statute provides that "[w]hoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or

19

"in lieu of describing the specific conduct it forbids, [the] statute's general terms incorporate constitutional law by reference." United States v. Lanier, 520 U.S. 259, 265, 117 S. Ct. 1219, 1224 (1997). We review questions of constitutional law de novo. United States v. Brown, 364 F.3d 1266, 1268 (11th Cir. 2004).

The Supreme Court has held that defendants must have "fair warning" that their actions violate a constitutional right, which requires that they "reasonably can anticipate when their conduct may give rise to liability, by attaching liability only if the contours of the right violated are sufficiently clear that a reasonable official would understand that what he is doing violates that right." Lanier, 520 U.S. at 270, 117 S. Ct. at 1227 (internal quotations, citations, and alterations omitted). This Court uses two methods to determine whether a reasonable official would understand that his conduct violates a constitutional right. Carollo v. Boria, 833 F.3d 1322, 1333 (11th Cir. 2016). Under the first, we ask whether "binding opinions from the United States Supreme Court, the Eleventh Circuit Court of Appeals, and the highest court in the state where the action is filed . . . gave [the defendant] fair warning that his [action] was unconstitutional." Id. (quoting Merricks v. Adkisson, 785 F.3d 553, 559 (11th Cir. 2015)). In the second—the so-

_____

penalties, on account of such person being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens," shall be subject to specified criminal penalties. 18 U.S.C. § 242.

20

called "obvious clarity" inquiry—we ask whether the defendant's " 'conduct lies so obviously at the very core of what [federal law] prohibits that the unlawfulness of the conduct was readily apparent . . . , notwithstanding the lack of fact-specific case law' on point." Id. (quoting Moore v. Pederson, 806 F.3d 1036, 1047 n.4 (11th Cir. 2015)). Where, as here, an official's conduct is not "so outrageous that it clearly goes 'so far beyond' [acceptable] borders," Fils v. City of Aventura, 647 F.3d 1272, 1291 (11th Cir. 2011), we will confine our inquiry to the first method.[13]

As an initial matter, we have no trouble concluding that Cochran's actions with respect to S.P.'s cellphone implicate the protections of the Fourth Amendment. As the Supreme Court has noted, the Fourth Amendment's protections extend beyond criminal investigations, and apply when the government is performing other functions. As relevant to this case, it is clear that the "Fourth

---

[13] Additionally, "[o]ur case law has made clear that 'obvious clarity' cases will be . . . rare in general, [and] will be even more rare in the Fourth Amendment expectation of privacy context because it is inherently fact-specific, thus not lending itself to clearly established law." Coffin v. Brandau, 642 F.3d 999, 1015 (11th Cir. 2011) (en banc). While there might exist hypothetical circumstances under which a government employer's search of an employee's cellphone is so egregious and so divorced from any work-related purpose that the search would trigger the obvious clarity rule, we cannot conclude that this is such a case. And, in this case, we would be reluctant to simply assume that the jury resolved against Cochran every possible fact relevant to this issue. The instruction given to the jury falls woefully short of what would constitute an acceptable restatement of the law. Under the jury instruction, a proper search of a cellphone could occur only pursuant to "a search warrant issued by a neutral and detached judicial officer," with the owner's consent, or "in very limited circumstances" upon a "reasonable belief that information stored in the cellular telephone can present physical injury to a third person." The jury instruction did not even attempt to address the factors which Supreme Court cases have suggested; and, under the facts of this case, the instruction approached telling the jury to convict Cochran.

21

Amendment applies as well when the Government acts in its capacity as an employer." City of Ontario, Cal. v. Quon, 560 U.S. 746, 756, 130 S. Ct. 2619, 2627–28 (2010) (citing Nat'l Treasury Emps. Union v. Von Raab, 489 U.S. 656, 109 S. Ct. 1384 (1989), and O'Connor v. Ortega, 480 U.S. 709, 107 S. Ct. 1492 (1987)).

However, although the Fourth Amendment is clearly implicated, we cannot conclude that either the Supreme Court or this Court has clearly established law that would have constituted "fair warning" to Cochran that his actions with respect to S.P.'s cellphone violated the Fourth Amendment. The Supreme Court cases suggest that it is relevant in the government employment context to consider the operational realities of the workplace, or the special needs of the workplace, or what would be regarded as reasonable and normal in a private employer context. For example, in 1989, the Supreme Court in National Treasury Employees Union v. Von Raab, indicated that the reasonableness of a government employee's expectation of privacy could be limited by operational realities of a workplace or by the context of certain types of public employment. 489 U.S. at 669–70, 109 S. Ct. at 1393–94. However, in 2010, the Supreme Court in Quon—noting that these statements in Von Raab derived from the Court's decision in O'Connor—stated that, "[i]n the two decades since O'Connor, however, the threshold test for determining the scope of an employee's Fourth Amendment rights has not been

22

clarified further." Quon, 560 U.S. at 757, 130 S. Ct. at 2628. In other words, as this Court has already noted, the Supreme Court in Quon expressly declined "even to set forth the governing principles to answer" the constitutional question of whether a government employee's privacy expectations were reasonable. Rehberg v. Paulk, 611 F.3d 828, 845 (11th Cir. 2010).

Thus, the decisions of this Court and the Supreme Court have established little more than the following proposition: "[W]here a Fourth Amendment intrusion serves special governmental needs, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the Government's interests." Von Raab, 489 U.S. at 665, 109 S. Ct. at 1390–91. However, in the context of a cellphone and the protections it is afforded in the contemporary government workplace, neither the individual's privacy expectation nor the government's interest are clearly established and accordingly we cannot conclude that Cochran had "fair warning."[14]

---

[14]    Moreover, even if the standards for judging an individual's privacy expectation or the government's interest were clearly established, a defendant such as Cochran would still be left in the unenviable position of having to correctly balance those two competing interests. This balancing act—as we have previously noted—is a case-by-case process which does not lend itself to clearly established law. See Dartland v. Metro. Dade Cty., 866 F.2d 1321, 1323 (11th Cir. 1989) (noting, in the First Amendment context, that when "[t]he court must necessarily balance [competing] interests on a case-by-case basis . . . there will rarely be a basis for an a priori judgment that the [employer] violated 'clearly established' constitutional rights" (quoting Noyola v. Tex. Dep't of Human Res., 846 F.2d 1021, 1025 (5th Cir. 1988)).

23

On the one hand, the Supreme Court has expressly declined to define the scope of the relevant privacy interest given the "changes in the dynamics of communication and information transmission [that] are evident not just in the technology itself but in what society accepts as proper behavior." Quon, 560 U.S. at 759, 130 S. Ct. at 2629; see also id. ("Prudence counsels caution before the facts in the instant case are used to establish far-reaching premises that define the existence, and extent, of privacy expectations enjoyed by employees when using employer-provided communication devices."). Observing the Supreme Court's lesson that "it is uncertain how workplace norms, and the law's treatment of them, will evolve," id. at 759, 130 S. Ct. at 2630, this Court has echoed their warning that "[t]he judiciary risks error by elaborating too fully on the Fourth Amendment implications of emerging technology before its role in society has become clear," Rehberg, 611 F.3d at 846 (quoting Quon, 560 U.S. at 759, 130 S. Ct. at 2629).

While this may be—and we think is—sound judicial practice, it does precious little to provide "fair warning" to the governmental official tasked with interpreting our decisions. One could certainly point to Quon's focus on the government-provided nature of the pager at issue there as evidence that the personal cellphone here might be entitled to an inherently greater expectation of privacy. Likewise, the ease with which the Supreme Court recently found that police may not, as a matter of course, search an arrestee's cellphone incident to a

lawful arrest may suggest that the Court is moving towards the recognition of heightened privacy interest in cellphones generally. See Riley v. California, 573 U.S. —, —, 134 S. Ct. 2473, 2494–95 (2014) ("Modern cell phones are not just another technological convenience. With all they contain and all they may reveal, they hold for many Americans 'the privacies of life . . . .' ") (unanimous opinion).[15] But such hints at the possible direction of the developing law do not rise to the level of fair warning that would allow a reasonable official to understand that what he is doing violates a clearly established constitutional right.

Likewise, even assuming that S.P. had some demonstrable expectation of privacy in her cellphone, the relevant case law provides no meaningful opportunity for Cochran to balance that expectation against the government's interest. The Supreme Court's decision in O'Connor—a plurality opinion which has been cautiously applied[16]—tells us that, "when conducted for a noninvestigatory, work-related purpose or for the investigation of work-related misconduct, a government employer's warrantless search is reasonable if it is justified at its inception and if the measures adopted are reasonably related to the objectives of the search and not

---

[15]    Of course, Riley was issued after the events here, and thus could not have contributed to any "fair warning" to Cochran.

[16]    For instance, in Quon, the Supreme Court expressly avoided applying the contested portion of the O'Connor framework, and, as noted above, the Court pointed out that "[i]n the two decades since O'Connor, however, the threshold test for determining the scope of an employee's Fourth Amendment rights has not been clarified further." Quon, 560 U.S. at 757, 130 S. Ct. at 2628.

excessively intrusive in light of the circumstances giving rise to the search." Quon, 560 U.S. at 761, 130 S. Ct. at 2630 (quoting O'Connor, 480 U.S. at 725–26, 107 S. Ct. at 1502 (plurality opinion)). We, of course, adhere to the Supreme Court's view that the right at issue need not have arisen in a situation that is "fundamentally similar" to the instant case in order to provide fair warning, see Lanier, 520 U.S. at 269, 117 S. Ct. at 1227, but we note the inherently fact-specific nature of the inquiry required under the O'Connor plurality.

No decision of the Supreme Court, this Court, or the highest court of Georgia has further clarified the standards by which intrusions into the privacy expectations of governmental employees at work must be judged. And no such decision has addressed a sufficiently similar factual situation so as to provide reasonable warning to Cochran that his conduct violated the constitutional rights of S.P. Accordingly, because we are unable to conclude that Cochran had the required "fair warning" that his actions were in violation of a clearly established constitutional right, his conviction on Count Three must be vacated.

## E. Motion to Sever

Finally, Cochran challenges the denial of his motion to sever Counts Two and Three, which a magistrate judge ruled were sufficiently similar in character to be joined with the other charges. Generally, we undertake a two-step analysis to determine whether separate charges were properly tried at the same time. United

States v. Slaughter, 708 F.3d 1208, 1213 (11th Cir. 2013) ("First, we review de novo whether the counts were properly joined under Federal Rule of Criminal Procedure 8(a). Second, we must determine whether the District Court abused its discretion under Federal Rule of Criminal Procedure 14 by denying the motion to sever." (internal citations omitted)). However, where a magistrate judge rules on the motion rather than a district judge, Federal Rule of Criminal Procedure 59 governs and "requires the defendant to serve and file objections to non-dispositive rulings by a magistrate judge within [fourteen] days." United States v. Schultz, 565 F.3d 1353, 1360 (11th Cir. 2009); Fed. R. Crim. P. 59(a). A defendant's "[f]ailure to object in accordance with this rule waives [his] right to review." Fed. R. Crim. P. 59(a).

It is clear that Cochran did not comply with the procedural requirements of Rule 59(a) and has thereby waived his right to raise this issue on appeal. The motion to sever was a non-dispositive motion properly committed to the magistrate judge for consideration. The magistrate judge ruled on the issue and Cochran did not challenge that ruling in the district court. Accordingly, we lack jurisdiction to review the magistrate judge's order. See, e.g., United States v. Brown, 441 F.3d 1330, 1352 (11th. Cir. 2006).

### III. Conclusion

Based on the foregoing, Cochran's conviction as to Count Three is VACATED. The remainder of the convictions are AFFIRMED.

**VACATED in part and AFFIRMED in part.**